ANN HARTLEY
Texas Bar No. 09157700
Assistant Attorney General
Financial Litigation Division
Office of the Attorney General of Texas
PO Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1313
Fax: (512) 477-2348
ann.hartley@oag.state.tx.us

FILED
CLERK, U.S. DISTRICT COURT
SEP 18 2009
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

Lodged
CLERK, U.S. DISTRICT COURT
SEP 17
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

MICHAEL RIVERA and DAN ABELL, individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

BIO-ENGINEERED SUPPLEMENTS & NUTRITION, INC., d/b/a BSN, INC., a Florida Corporation, CHRISTOPHER FERGUSON, an individual, and DOES 1 through 250, inclusive;

Defendants.

Case No. SACV07-1306 JVS (RNBx)

**BRIEF AMICI CURIAE OF THE ATTORNEYS GENERAL OF ALABAMA, ALASKA, ARKANSAS, ARIZONA, COLORADO, CONNECTICUT, ILLINOIS, IOWA, KANSAS, MISSISSIPPI, NEW JERSEY, NEW MEXICO, NEVADA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, VERMONT, and the STATE OF HAWAII OFFICE OF CONSUMER PROTECTION**

**IN OPPOSITION TO THE TO PROPOSED SETTLEMENT AGREEMENT**

Settlement Approval Hearing: October 19, 2009
Time: 1:30 p.m.
Courtroom: 10C
Judge: Honorable James V. Selna
Complaint Filed: November 6, 2007
Trial Date: None

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . iii

I. WORTHLESS COUPONS . . . 2

II. ILLUSORY REFUND AND UNREASONABLY ONEROUS CLAIMS PROCEDURE . . . 5

III. GROSSLY INADEQUATE NOTICE . . . 9

IV. EXCESSIVE RELEASE, IMPOSED ON TOO MANY . . . 12

V. UNFAIR OPT-OUT PROCEDURE . . . 13

VI. ILLUSORY INJUNCTIVE RELIEF . . . 13

VII. ABSENCE OF DETERRENT EFFECT . . . 15

VIII. EXCESSIVE ATTORNEY FEES . . . 15

LIST OF EXHIBITS

ii

ATTORNEY GENERAL BRIEF IN OPPOSITION TO PROPOSED CLASS ACTION SETTLEMENT

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Boeing Co. v. Van Gemert*
444 U.S. 472 (1980) . . . . . . . . . . 16, 19

*Figueroa v. Sharper Image*
517 F.Supp.2d 1292 (S.D. Fla. 2007) . . . . . . . . . . 2

*In re Fine Paper Antitrust Litigation*
98 F.R.D. 48 (E.D. Pa. 1983), judgment aff'd in part, rev'd in part on other grounds, 751 F.2d 562, 17 Fed. R. Evid. Serv. 222 (3rd Cir. 1984) . . . . . . . . . . 20

*Mullane v. Central Hanover Bank & Trust Co.*
339 U.S. 306 (1950) . . . . . . . . . . 12

*Rodriguez v. West Publishing Corp.*
563 F.3d 948 (9th Cir. 2009) . . . . . . . . . . 5

*Sprague v. Ticonic Nat. Bank*
307 U.S. 161 (1939) . . . . . . . . . . 17

*State of California v. Levi Strauss*
(1986) 41 Cal. 3d 460 . . . . . . . . . . 15

*Staton v. Boeing Co.*
327 F.3d 938 (9th Cir. 2003) . . . . . . . . . . 15-19

*Strong v. Bellsouth Telecomm., Inc.*
173 F.R.D. 167 (W.D.La. 1997) . . . . . . . . . . 19

*Synfuel Tech., Inc. v. DHL Express (USA), Inc.*
463 F.3d 646 (7th Cir. 2006) . . . . . . . . . . 2

*Vizcaino v. Microsoft Corp.*
290 F.3d 1043 (9th Cir. 2002) . . . . . . . . . . 20

## *STATUTES AND FEDERAL RULES*

28 U.S.C. § 1711, Findings (a)(3)(A), (C) . . . . . . . . . . 2

28 U.S.C. § 1712(a) . . . . . . . . . . 15

28 U.S.C. §§ 1712 and 1715 . . . . . . . . . . *passim*

Federal Rule of Civil Procedure 23(c)(2)(B) . . . . . . . . . . 11, 12

Federal Rule of Civil Procedure 23(e) . . . . . . . . . . 15

Federal Rule of Civil Procedure 65(d) . . . . . . . . . . 13

## *OTHER AUTHORITIES*

*Court Awarded Attorney Fees, Report of the Third Circuit Task Force* 108 F.R.D. 237 (1985). . . . . . . . . . . 17

3 NEWBERG ON CLASS ACTIONS § 9:72 (4th ed.). . . . . . . . . . . 16

4 NEWBERG ON CLASS ACTIONS § 11:29 (4th ed.) . . . . . . . . . . 16

4 NEWBERG ON CLASS ACTIONS § 13:76 (4th ed.) . . . . . . . . . . 16

4 NEWBERG ON CLASS ACTIONS § 14:6 at 551 (4th ed.). . . . . . . . . . . 17

The National Association of Consumer Advocates *Class Action Guidelines - Revised*, 1590 PLI/Corp 285 (2007) . . . . . . . . . . 2, 3

ANN HARTLEY, Texas Bar No. 09157700
Assistant Attorney General
Financial Litigation Division
Office of the Attorney General of Texas
PO Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1313
Fax: (512) 477-2348
ann.hartley@oag.state.tx.us

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

MICHAEL RIVERA and DAN ABELL, individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

BIO-ENGINEERED SUPPLEMENTS & NUTRITION, INC., d/b/a BSN, INC., a Florida Corporation, CHRISTOPHER FERGUSON, an individual, and DOES 1 through 250, inclusive;

Defendants.

Case No. SACV07-1306 JVS (RNBx)

**BRIEF AMICI CURIAE OF THE ATTORNEYS GENERAL OF ALABAMA, ALASKA, ARKANSAS, ARIZONA, COLORADO, CONNECTICUT, ILLINOIS, IOWA, KANSAS, MISSISSIPPI, NEW JERSEY, NEW MEXICO, NEVADA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, VERMONT, and the STATE OF HAWAII OFFICE OF CONSUMER PROTECTION**

**IN OPPOSITION TO THE TO PROPOSED SETTLEMENT AGREEMENT**

Settlement Approval Hearing: October 19, 2009
Time: 1:30 p.m.
Courtroom: 10C
Judge: Honorable James V. Selna
Complaint Filed: November 6, 2007
Trial Date: None

The Attorneys General of the States of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, Illinois, Iowa, Kansas, Mississippi, New Jersey, New Mexico, Nevada, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Vermont, and the State Office of Consumer Protection of the State of Hawaii ("Attorneys General"), on behalf of their interest in protecting consumers within their respective states and in their capacity as *amici curiae*, have identified several aspects of the proposed coupon settlement in this case which render it unfair, unreasonable, and inadequate for class members. The Attorneys General have no financial stake in

this litigation. Under Sections 1712 and 1715 of the Class Action Fairness Act ("CAFA") the Attorneys General respectfully ask this Honorable Court to reject the Proposed Settlement Agreement and Release presented by counsel for Defendants ("Proposed Settlement") because it is worse for class members than no settlement. After *Figueroa v. Sharper Image*, 517 F.Supp.2d 1292 (S.D. Fla. 2007) it is surprising to see a class action settlement proposal that exhibits all the hallmarks of an agreement that not only benefits everyone except the class members but leaves the class members in a worse position than they would find themselves had the lawsuit never been brought. This Proposed Settlement is subject to heightened scrutiny under CAFA, and the burden is on the settling parties to prove this settlement is fair, adequate and reasonable. *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006). When all the cash goes to expenses and lawyers, and class members receive only discounts of dubious value, a settlement is not fair, and Congress expressly found, in enacting CAFA, that class members are harmed when class action counsel are awarded large fees, leaving class members with coupons or other awards of little or no value, and confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights. 28 U.S.C. § 1711, Findings (a)(3)(A), (C). This Proposed Settlement is a paradigm of an unfair, inadequate, and unreasonable class action settlement, offering coupons with negative value that require consumers to do *more* business with the Defendant, refunds that will not be paid without satisfaction of ridiculous conditions, unenforceable injunctive "relief," an advertising venture posing as a charitable provision, and notice provisions that will deter all but the most dedicated sleuth from discovering that the Proposed Settlement even exists. In contrast with the nominal and hypothetical relief the Proposed Settlement offers class members, class counsel stand to receive a substantial payment of approximately $6.5 million in attorney fees and costs. The Attorneys General object to the following elements of the Proposed Settlement:

## I. WORTHLESS COUPONS

1.     The National Association of Consumer Advocates ("NACA") published its *Class Action Guidelines - Revised*, 1590 PLI/Corp 285 (2007), in which it explained the reasons that coupon settlements should generally be avoided. Relevant Sections of the Guidelines are attached

as Exhibit A. (Guideline 1 - The Propriety of Class Actions When Individual Recoveries are Small; Guideline 4 - Certificate Settlements; Guideline 7 - Cy Pres Awards; Guideline 8 - Attorney Fee Considerations; Guideline 9 - Class Member Releases; Guideline 11 - Improved Notice of Settlement; Guideline 12 - Claim Forms.) These include the fact that most of the class may be unable or unwilling to make a future purchase from the defendant, as well as policy considerations that disfavor "rewarding the wrongdoing defendant with new sales from the victims of its illegal practices." *Id.* at 313-14.

2. The "rebate" coupons described in Paragraph III. D. 1 of the Proposed Settlement, in the amounts of $5.00 and $3.00 depending on the product, are available only to consumers who first spend approximately $63.99 or $66.99 buying a BSN Product. (See Exhibit B, pages from the BSN Online web site on September 15, 2009 advertising the products at issue in this lawsuit, Cellmass, Nitrix, and N.O.-Xplode ("BSN Products"). The Proposed Settlement is unclear about how, and whether, a consumer actually redeems the rebate coupons. The redemption process is not spelled out in the Proposed Settlement like the "Refund" process is; there is no promptness requirement, nor is there any express statement in the Proposed Settlement that mailing in a rebate coupon will actually cause cash to be sent to the consumer. In fact, the Summary Notice (Exhibit C to the Proposed Settlement) describes "rebates on *future* purchases of BSN products." The Refund process is handled by the Settlement Administrator (¶ IV. A.), but no responsibility is assigned for the "rebate" process. The only standard is a limit ("Rebates shall be capped at $50.00 per customer per year." ¶ III. D. 1.)

3. The word "cash" does not appear in this section of the Proposed Settlement. The "Summary Notice" proposed to go to Class Members refers to "rebates on future purchases of BSN products," not cash. The term "rebate" is not defined in the Proposed Settlement.

4. This "rebate" does not involve cash from BSN to class members, it involves another chance for a class member to send cash to BSN.

5. There is nothing in the Proposed Settlement to negate the interpretation that these coupons have no actual cash value but merely reduce the prices of the NEXT bottle of a BSN Product by $3.00 or $5.00, to be administered by individual retail dealers. For a consumer to reap

the full **$50.00** rebate "benefit" per year, he would have to buy at least ten bottles of a BSN Product, at a cost of at least **$639.90**.

6. These coupons are not transferrable, there is no reasonable expiration limit, and they are not available to all consumers who bought the BSN Products alleged to be deceptively labeled. Pay-to-play is the regime for this coupon settlement – the consumer must pay $63.99 or $66.99 for the right to either receive $3.00 or $5.00, or to pay $3.00 or $5.00 less *again*, depending on how the Proposed Settlement is interpreted. The Proposed Settlement inadvertently dispenses with the fiction that the rebate coupon program is even aimed at Class Members; it refers to "consumers," rather than Class Members.

7. The "free sample pack" that accompanies each redeemed coupon is alleged to have a retail value of $2.15. BSN retains the discretion to choose which "free" product is given, so it is improper to assume the "free sample pack" has any value whatsoever to the consumer, regardless of the retail value BSN assigns.

8. The calculation that the rebate portion of the settlement could amount to $23,500,000.00 of <u>value to the Settlement Class</u> "when fully utilized" is a made-up number, conjured from "historical retail sales" and multiplying dollar amounts that do not represent "value to the Settlement Class." For the rebate portion of the Proposed Settlement to be "fully utilized," BSN's customers would have to pay handsomely for the privilege of enjoying the benefits. Even if the value of each rebate coupon, to the consumer, is deemed to be $5.00, BSN would reap ($23,500,000.00 / $5 = 4,700,000.00) X $639.90 = **$3,007,530,000.00 in sales**. That money comes **from** consumers/customers/Class Members. It is not compensation for the Class Members and it is not a deterrent for BSN.

9. Through the "when fully utilized" qualifier, BSN further leverages the "value" of the Proposed Settlement: In recognition of the near-certain "possibility" that the rebate provision will not be fully utilized, BSN hurls itself into the briarpatch of market discounts in the next sentence (¶ III. D. 1.): "If, by April 30, 2010, total redemption of the rebates does not exceed $2,500,000.00 (including the retail value of all sample packs provided), Defendants shall offer for the following 12 months a 25% discount on all direct retail sales of any BSN product." This is just another promotion

dressed up as "compensation." The Proposed Settlement doesn't even bother trying to link this "compensation" to the "Settlement Class," because BSN obviously considers that the Settlement Class serves as their customer base and target for marketing.

10. The 25% discount is estimated, "based on historical sales of Defendants' products," to amount to "approximately $18,600,000.00 of value to the Settlement Class when fully utilized." If this discount is "fully utilized," the Settlement Class will *spend* (3 X $18,600,000.00), or $55.8 million dollars to reap this reward.

11. The 25% discount applies only to "direct retail sales," is based on the "standard retail price," which is not defined and could increase whenever BSN needs to advertise the discount, and it "may not be used in conjunction with other discounts or promotions that may be in effect." BSN Products are sold on the Internet by other companies. It is unclear whether those purchases count as "direct retail sales." Further, what portion of BSN sales are "direct retail sales? What is a discount or promotion? The lack of definition makes this discount difficult to enforce at best, and possibly illusory.

12. Finally, the rebate / discount part of the compensation section has the biggest numbers ($23,500,000.00 + $18,600,000.00 = ) $42,100,000.00, and presumably attorney fees are figured in part from the "value" of the settlement, but these "benefits" go to all of BSN's customers, not just the Settlement Class. To the extent they benefit other customers, they are not part of the Settlement that benefits the Class Members and should be paid from BSN's advertising budget, not used in the calculation of attorney fees. A good indicator of whether a settlement is actually beneficial is that it is "in cash, not in kind." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

## II. ILLUSORY REFUND AND UNREASONABLY ONEROUS CLAIM PROCEDURE

13. Under the Proposed Settlement, obtaining a refund will be nearly impossible, and possibly risky. (¶ III. D. 2, p. 8). Only an "Authorized Claimant" is eligible to get a refund check. The defined refund is $15.00 for each CEM3 Product purchased during the Class Period, with a limit of $30 per Authorized Claimant, regardless of what the claimant actually paid.

14. An Authorized Claimant is defined (¶ I. A, p.1) as "a Settlement Class Member who timely submits a valid Claim Form." A valid Claim Form is defined (¶ I. D., p.1) as the form

Settlement Class Members must submit to participate in the refund provisions substantially in the form attached as Exhibit A. Exhibit A ("CLAIM FORM") has three offensive features.

15. The worst and most unreasonable feature is that a valid Claim Form must have, for each bottle, "a *receipt* from a retail store or online retailer for my purchase of CEM3 Products." The Claim Period goes back to 2003, and it is extremely unlikely that anyone will have receipts for consumable products purchased six years ago. Producing six-year old receipts from an "online retailer" would be a special challenge.

16. BSN has not volunteered the obvious – that it might have sold BSN Products from its own web site, and that it has within its records all the information to know exactly who bought how much of which products, when and for what price. Neither receipts nor oaths should be required of claimants who purchased BSN Products from BSN's web site or any other web site to which BSN has or could obtain access for purposes of issuing refunds. The refund process is unreasonably cumbersome, designed to deter all but the organized, receipt-keeping, diligent purchaser of BSN Products who reads, and understands the Legal Notices section of USA Today (see below), promptly and correctly responds, and is willing to swear on penalty of federal perjury that he recalls the contents of BSN Product labels from as far back as 2003.

17. The requirement for receipts alone guarantees that hardly anyone will be able to submit a "valid" Claim Form, and the risk that BSN will actually have to pay any refunds is extremely low. Even if the unreasonably low maximum amount of refunds ($1,500,000.00) is paid out, however, Class Counsel stand to be paid over four times this amount "immediately" after the lawsuit is over. (¶¶ 3. F and I. G.)

18. Second, the claim must be made "under penalty of perjury under the laws of the United States that the foregoing is true and correct." If the claimant has receipts, an oath is unnecessary. One *or* the other should suffice to protect BSN from unscrupulous claimants. Some people's religious beliefs prohibit such oaths. The most apparent purpose of this burden is to intimidate claimants and discourage refunds. Further, since the claimant supplies only name, address, signature and date (in addition to receipts), the majority of the sworn claim consists of the

words of BSN. It is therefore unfair to hold the claimant to the truth and correctness of BSN's recitals, especially the following:

19. The first item under "Qualifying Information" requires the claimant to state under penalty of perjury that the LABEL of the BSN Products at issue said that these products contained Creatine Ethyl Ester Malate or CEM3. Unless the claimant kept the bottle or remembers the label, there is no way for the claimant to know this. This is grossly unfair, since BSN knows better than the claimants what its labels said. (If BSN did sell any Cellmass, Nitrix or N.O.-Xplode without the misleading label during the Claim Period, BSN is in a better position to know than the claimant). Unless the claimant is willing to declare under penalty of perjury that a label on a bottle purchased years ago contained the precise statement that the Products contained CEM3, there will be no refund.

20. This concern is not idle or farfetched: Item 3 in the Frequently Asked Questions appearing on the settlement website is,

> Q: What products must I have purchased to be eligible for participation in the Refund provided by the Settlement Fund?
>
> A: For the Refund, the products you need to have purchased are: Cellmass, Nitrix and N.O.-Xplode in containers which have either "CEM3" or "Creatine Ethyl Ester Malate" on the label. Products in bottles that have "AVPT" on the label are not covered by the Settlement.

According to the Claim Form, "The Claims Administrator may require proof to verify the accuracy of your claim. Please retain copies of any and all documents that may support your claim." *Labels* from old bottles can be required as "documents that may support your claim."

21. Third, the Settlement Class includes everyone who bought "CEM3 Products." (¶ I.O., p. 3). "CEM3 Products" (defined at ¶ I.B., p.1) includes not only products labeled as containing CEM3 but products *represented* as containing CEM3. The result of this cleverness is that a consumer with receipts and willing to declare all required things under penalty of perjury can't get a refund for a CEM3 Product that was represented as containing CEM3 but not LABELED as such. This consumer, however, will be forced to "release" BSN because he is in the group of people who purchased the CEM3 Product that was mis-represented but not mis-labeled.

22. In addition to the prohibitive procedure for getting a refund, there is the matter of an unfair LIMIT on refunds, which mocks the very notion of compensation. The first sentence of the

Refund paragraph says, "Authorized Claimants will be provided a refund check of $15.00 for each CEM3 Product purchased during the Class Period." The next sentence negates this provision ("Cash refunds will be limited to a maximum of $30.00 per Authorized Claimant.") The more mis-labeled BSN Products a person has bought, the more that person should be compensated with refunds.

23. BSN limits the rebates, in effect for 3 years, to $50 per customer per year. For Cellmass, with a $5.00 coupon, BSN thus limits customers to TEN bottles per year for the rebate program. (For the other two CEM3 Products, with $3.00 coupons, a $50 cap effectively limits the customer to 16 2/3 bottles per year.) If a person uses this much of the CEM3 Products, what justification is there for restricting the refund compensation to TWO bottles for the whole period, which is almost 6 years?

24. The dollar limit on BSN's obligation to make cash refunds is $1,500,000.00, which is dwarfed by the purported value of the rebate and discount provisions ($23,500,000.00 and $18,600,000.00): $42,100,000.00.

25. One final guarantee that BSN will pay only a minuscule refund amount is the unreasonably short claim period, especially given the inadequate "notice" which starts the clock. The Claims Deadline is forty-five days after the last date on which Publication Notice is published in the notices section of the national edition of USA Today. (¶ I. C.)

26. USA Today's web site specifies that,

> **For clarity and readability, we recommend using type sized at 8 point or larger** in the advertising creative. Minimum acceptable point size/font is 6 point Helvetica.

(http://www.usatoday.com/marketing/media_kit/classified/classified_usat_typography.html)

27. However, for legal notices like those BSN plans to use to notify people of their rights under the Proposed Settlement, the "minimal acceptable" small type is standard: ("All legal notices are formatted with a 6 point sans serif font.") http://www.usatoday.com/marketing/media_kit/classified/classified_usat_legalnotice_tips.html

## III. GROSSLY INADEQUATE NOTICE

28. The Proposed Settlement has three methods for giving notice to Class Members, each inadequate. The first requires that Defendants will mail or e-mail the Full Class Notice "to each member of the Settlement Class *for whom Defendants have a mailing or email address*."

29. In the letter to the Attorney General of Texas, providing Notice pursuant to Section 1715 of the Class Action Fairness Act (Exhibit C, ¶ 7), counsel for Defendants declared he was unable to estimate the number of class members in Texas because:

> The products at issue in the Action are sold to consumers through retail outlets in every state. Although BSN has sold several million units of the products at issue nationwide during the relevant period, **BSN does not have records of the identities or numbers of individual consumers who purchased the products at retail**. It is therefore **not feasible at this time to identify** the names of all class members who reside in each state or to estimate the total number of class members.

[Emphases added].

30. Sending mail or email to actual class members is "not feasible," and any actual notice to result from the "mail or email" provision in Section V. of the Proposed Settlement will therefore, according to counsel for Defendants, be negligible. Since this effort is to have been accomplished no later than twenty days following entry of the Preliminary Approval Order, counsel for Defendants should be able to tell the Court and the Class Members how many mail and e-mail notices were sent by August 5, 2009 (twenty days after July 14, 2009).

31. There is no specified duty of diligence, such as a commitment to send an e-mail to everyone who has contacted BSN through its website or other Internet sites. The Proposed Settlement could require BSN to send notices to specified customer lists, or a commitment to use all information available to its MARKETING department. Under the Proposed Settlement, BSN assumes no meaningful obligation to send mail or e-mail notice.

32. The second required notice method is that the Claims Administrator will create a website displaying the Full Class Notice and downloadable Claim Forms. The web site was to be up by August 5, 2009. Obviously the web site will provide no actual notice unless a person is *ALREADY looking at it.*

33. A Google search for the web site, on August 11, 2009, using search terms "BSN Settlement," "BSN Class Action," "BSN Lawsuit," "BSN Supplements Lawsuit," "BSN Class Action Settlement," and even "BSN Settlement website" did not produce the Settlement web site on the first page. See Exhibits D1-D6, the first pages of these searches.) The actual web address for the BSN Proposed Settlement is www.Supplement.Settlement.com, unlikely to be found except by a person who already knows the address. The BSN, Inc. web site makes no mention of the lawsuit or the settlement, though BSN has had a "sponsored link" on the "BSN Settlement" search result.

34. The best clues for finding the web site were gleaned from body-builder blog postings mentioning the settlement (e.g. T-Nation.com, which excerpts "Sadly, a lot of BSN customers won't even hear about this lawsuit" or thabobblehead.wordpress.com, which notes, "The supplement marketing geniuses figured settled [sic] on a way to say sorry and keep us coming back for more."), or quoting the notice. Buried in the quoted notice found at thabobblehead.wordpress.com and forums.slickdeals.net is the settlement website address.

35. The notice has a Frequently Asked Questions section. The last question, # 19, is "I have additional questions. Please provide me contact details." The answer begins with, "We are happy to help you." A "toll free number" is then listed: **1-800-877-582-4348**. Real phone numbers have *ten* digits including the area code. The results of calling various permutations of the given number are as follows:

A. 1-800-877-5824: busy signal

B: 1-800-582-4348: "Call the Talk Line at 1-800-482-TALK for exciting people nationwide, that's 482-TALK."

C: 1-877-582-4348: Welcome to the "Supplement Settlement Hotline," an automated line with no opportunity to speak to a human. The only two options for the caller are: To listen to Frequently Asked Questions, press 1. To request that a notice and claim form be sent to you, please Press 2.

Pressing 0 produces "What was that again?"

Pressing 0 again produces: "I didn't get that. Using your keypad, please select a valid choice."

Pressing 0 again produces: "I'm sorry I still didn't get that. That keypad option is not available at this time. Let me take you back to the beginning."

36. Apart from the non-responsive wrong number that purports to be a "hotline," two meager sources for assistance appear: The main switchboard telephone numbers for the law firms of Class Counsel and BSN Counsel are provided (Page 3 of the Notice, nowhere in the Summary Notice ), and Class Members are advised (Page 4 of Notice, under "How to Obtain More Information") that, "You may obtain additional information by visiting the Office of the Clerk of the Court at 411 West 4th Street, Santa Ana California, during regular court hours, to inspect the pleadings and other papers maintained there." Though efficient, this is not a fair method for disposing of legitimate questions and complaints from Class Members.

37. The third required notice method is "Publication Notice." (¶ III. A. 3.) Defendants will publish the Publication Notice attached as Exhibit D to the Proposed Settlement on two occasions, no later than thirty and forty-five days after July 14, 2009, in the Notices Section of USA Today.

38. When BSN wants to get a message out, it uses its web site, it advertises on the Internet, and there is no reason it should not do so for this lawsuit.

39. An Internet press release, directed at the magazines, organizations, and web sites concerned with nutritional supplements and body building would be more effective at alerting the community of people who have purchased BSN's Products than two small-print notices published in the Legal Notices section of USA Today. BSN has demonstrated its ability to competently publicize not only claims about its products but also its opinions about this lawsuit. When it has an incentive to do effective publicity, it can. In this case, less notice is more advantageous for BSN. (For example, it is possible that blogs and message boards would enable people to spread word of the Proposed Settlement, discuss it, realize its unfairness, and organize to object to it.)

40. The Notices section of USA Today is not a reasonable way to advise people of rights they might lose if they do not act in short order because it does not meet the standard applicable to class actions as set out in Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure - "the best notice that is practicable under the circumstances."

41.     A Google search with "BSN Class Action" shows that BSN issued an online press release December 14, 2007 shortly after the lawsuit was filed. (See Exhibits E and F, true copies from the Internet on September 15, 2009, showing the first three pages of results from the "BSN Class Action" search and BSN's press release, linked at the fourth entry.)

42.     A Google search with "BSN Cellmass Lawsuit" shows that BSN issued an online press release December 28, 2007 which was posted on the "Ironmagazine.com" web site. (See Exhibits G and H, true copies from the Internet on September 15, 2009, showing the first three pages of results from the "BSN Cellmass Lawsuit" search and BSN's press release, linked at the fifth entry.)

43.     A Google search with "BSN Nitrix Lawsuit" shows that BSN's online press release of December 14, 2007 was posted on the "anonymousbodybuilding.com" web site. (See Exhibits I and J, true copies from the Internet on September 15, 2009, showing the first three pages of results from the "BSN Nitrix Lawsuit" search and BSN's press release, linked at the first entry.)

44.     Constitutional due process requires that absent class members be provided "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Rule 23 of the Federal Rules of Civil Procedure requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Fed. R.Civ.P.23(c)(2)(B)." Section V of the Proposed Settlement does not require BSN to give the best notice practicable under circumstances of current Internet and other electronic communication capability; it validates a disgracefully stingy notice standard at the direct expense of the Settlement Class.

## IV.  EXCESSIVE RELEASE, IMPOSED ON TOO MANY

45.     The Proposed Settlement imposes a release of all claims on the "Settlement Class," which includes not just Class Members who receive actual compensation but, incredibly, "all persons who purchased CEM3 Products in the United States, its territories, or at any United States military facility or exchange for personal use and not for resale from November 6, 2003 through the date of Preliminary Approval [Order on Motion for Settlement entered July 14, 2009]." Every person who

ever purchased CEM3 Products in the United States will thus lose any claim against BSN even though a minuscule fraction of this group will even learn of the lawsuit (see objection to inadequate notice), and only a tiny fraction of *that* group will either ante up the pay-to-play price for a rebate coupon or successfully navigate the obstacles to receipt of an actual cash refund. The group of losers is large - the Settlement Class. The group of beneficiaries is small but does include BSN, which will be relieved of all liability from future claims from dissatisfied customers who manage to learn about BSN's marketing practices during the Class Period (November 6, 2003 through July 14, 2009).

46. The very structure of the Proposed Settlement is to release BSN for unfair corporate practices; particularly in light of the inadequate notice, the only people who should be bound by the release provisions of this Proposed Settlement are those who receive a refund or sign an actual release.

## V. UNFAIR OPT-OUT PROCEDURE

47. The Notice and Summary Notice (Exhibits B and C to the Proposed Settlement) impose unreasonable and unjustified conditions on a Class Member desiring to opt out of this settlement. Section VI of the Notice., "HOW TO OBJECT OR EXCLUDE YOURSELF FROM THE CLASS," (Page 3), requires that to opt out, a person must send the BSN Claims Administrator a letter or post card that contains not only the person's name and address, but "**the specific BSN product(s) you purchased** [and] **the date you purchased the product(s)**." This information is unlikely to be available to most Class Members, and requiring that they answer these questions is a transparent pretext for trapping unwilling Class Members into the Proposed Settlement. Of course, the deadline for opting out starts when the notices are "published." Opting out should not be difficult, especially when staying in is so disadvantageous. (¶ VI, Notice of Class Certification and Settlement of Class Actions, Exhibit B, and Page 2 of Summary Notice, Exhibit C to Proposed Settlement.)

## VI. ILLUSORY INJUNCTIVE RELIEF

48. An enforceable injunction must be "specific in terms" and "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Federal Rule of Civil Procedure 65(d). The permanent injunction to which BSN is willing to stipulate (prohibiting "selling, marketing, advertising, and/or manufacturing any products

claimed to contain CEM3") is mirrored by a statement in the Proposed Settlement that "BSN no longer manufacturers, advertises or promotes products including CEM3 in the formula and has reformulated each of the Products." On its face, the Proposed Settlement imposes on BSN an injunction against doing what BSN says it is not doing. This has no value to the Settlement Class, even if BSN's statement were true.

49. BSN's statement allows BSN's marketing affiliates and partners to engage in "selling, marketing, advertising, and/or manufacturing any products claimed to contain CEM3," the conduct BSN itself has forsworn. The hollowness of BSN's statement is easily demonstrated with a Google search of "BSN + CEM3." See Exhibit K, a true copy of the first three pages of the results of that search on September 15, 2009, showing plenty of sources for BSN Products alleged to contain CEM3. Exhibits L, M, N, O, P, Q, R, S, and T are the first pages of various Internet advertisements selling the BSN Products, Cellmass, Nitrix, and N.O.-XPlode, advertised as containing CEM3, on August 12, 2009. It is true that the advertisers are not BSN; however, through these marketing outlets BSN continues to promote, and presumably sell, the advertised products, its declaration in the Proposed Settlement is inaccurate, and an injunction that allows this marketing to continue is meaningless.

50. Plaintiffs' NOTICE OF MOTION AND MOTION BY PLAINTIFFS FOR PRELIMINARY INJUNCTION, filed January 21, 2009, recited relief that would have some value to the Settlement Class and to consumers in general. (A defendant could be required to send a disclaimer to its vendors, post a disclaimer on its website, recall offending products, and implement a corrective advertising campaign. Page 9, lines 15-27). The Proposed Settlement has none of these measures.

51. The court stated in the Tentative Order entered July 14, 2009, that, since it is unlikely that class members will recover more than a few hundred dollars, "the Court presumes that the plaintiffs are primarily interested in injunctive relief (Docket No. 180)."

52. The proposed injunction, however, is toothless and harmless to all, including BSN; it should not be considered a benefit to the Settling Class, nor should it contribute to the Court's calculation of attorney fees.

## VII. ABSENCE OF DETERRENT EFFECT

53. Except for paying Class Counsel, the Proposed Settlement is a boon to BSN. In addition to the broad release of claims, it is a marketing plan that BSN might undertake independently of a lawsuit. BSN stands to gain cash in the amount of approximately ten times the "value" of the rebates if they are "fully utilized."

54. BSN stands to benefit from a broad release of all claims by people who had no notice they had a claim against BSN and who also received no actual compensation from BSN.

55. BSN stands to earn a tax benefit for its "charitable donation" that is listed as an element of "Compensation to the Settlement Class," although the Settlement Class would benefit more from BSN contributing equivalent value to the class members in the form of refunds. A *cy pres* distribution is appropriate when there is an undistributed residue of money designated to a settlement fund. In this case there is *no* money designated to a settlement fund. *Cy pres* awards are appropriate when there is a nexus between the proposed use of a fund and the class on whose behalf the case was litigated. *State of California v. Levi Strauss* (1986) 41 Cal. 3d 460, 472-73. In this case, since BSN is to help choose the beneficiary, there is no reason to imagine that the "donation" (which is not cash but "$1,000,000.00 (retail price) worth of BSN *products*") will benefit the Settlement Class and every reason to expect that it will benefit BSN. Creation of a potential *cy pres* award does not change the fact that *class members*, as opposed to some outside entity chosen by BSN, will receive inadequate relief under the Proposed Settlement, while BSN reaps a marketing and sales bonanza.

## VIII. EXCESSIVE ATTORNEY FEES

56. Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination whether the settlement is "fundamentally fair, adequate, and reasonable." Fed.R.Civ.P. 23(e). CAFA requires attorney fee awards to class counsel in coupon settlements to be "based on the *value to class members* of the *coupons that are redeemed*." 28 U.S.C. § 1712(a).

57. In its order issued July 14, 2009, tentatively approving the Proposed Settlement, the Court is guided in its determination about attorney fees by *Staton v. Boeing Co.* 327 F.3d 938

(9th Cir. 2003) ("*Staton*"). *Staton* says that in a common fund case, the Ninth Circuit "has established 25% of the common fund as a benchmark award for attorney fees." *Id.* at 968. However, *this is not a common fund case*. Although the Proposed Settlement uses the term once in passing (¶ VI. C., providing that a claimant who fails to submit a valid and timely Claim Form "will be barred from receiving any portion of the Common Fund"), this term is <u>not defined</u> in the Proposed Settlement, nor does it appear in the Notice or Summary Notice. The omission of any definition is easily understood as a function of the fact that *there is no common fund* in this case. There is a stated maximum amount BSN will pay as cash refunds ($1,500,000.00), another stated amount that represents the alleged "value" of rebate coupons ($23,500,000.00), and another stated amount that represents the alleged "value" of a contingent 25% discount on BSN Products ($18,600,000.00). Needless to say, the sum of these imaginary numbers ($43,600,000.00) is a grand, bloated basis from which to calculate attorney fees as a percentage of a common fund. The attorney fees agreed by counsel for the parties are $6,250,000.00, fourteen percent of $43,600,000.00, but a much larger percent of the actual value of the recovery likely to be received by the Settlement Class. This number, $43,600,000.00, is not a common fund and cannot be credibly said to represent recovery for the class. There is no common fund in this case because BSN has not committed to paying any absolute, actual, dollars *except* attorney fees.

58. When a settlement is in the form of a lump sum common fund *for distribution to the class*, the defendant has no real interest in the mechanics of the settlement distribution to the individual class members. 3 NEWBERG ON CLASS ACTIONS § 9:72 (4th ed.). In this case, however, distribution of benefits to class members depends on claimants slogging through a diabolically cumbersome refund process imposed by BSN (for a cash benefit) or paying BSN approximately ten times the face "value" of the rebate coupon as a condition of "redeeming" it.

59. *When a common fund has been created* for the class, counsel for the class are entitled to fees out of the common fund. 4 NEWBERG ON CLASS ACTIONS § 11:29 (4th ed.), citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480-81 (1980). Fees, therefore, are paid proportionately by the class members out of their share of *the fund*. 4 NEWBERG ON CLASS ACTIONS § 13:76 (4th ed.). Counsel for the settling parties in this case wisely avoided defining (or creating) a common fund,

because the attorney fee share of such a fund would necessarily be either (a) exposed as a multiple, rather than a fraction, of the real number (something less than $1,500,000.00) - or (b) misleadingly portrayed as a modest fraction of $43,600,000.00, a wholly fictional number. As the *Staton* court noted:

> If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained. *See Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 266 (1985).

*Staton,* 327 F.3d 938, 964.

60. As this Court noted in its Tentative Order entered July 14, 2009, Class Counsel have not provided the specifics of a lodestar calculation or submitted any evidence to assist the Court in calculating the lodestar. (Page 12). They have, instead, guided the Court to a common fund analysis without actually creating a common fund or committing to distribution of the "$43,600,000.00," which subliminally poses as the justification for the attorney fee award. Six and a quarter million dollars may look reasonable when compared to an actual recovery of $43,600,000.00, but not when compared to the value of the Proposed Settlement to the Class Members.

61. The common fund doctrine allows a court to distribute attorney's fees from the common *fund that is created for the satisfaction of class members' claims* when a class action reaches settlement or judgment. *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 164 (1939).

62. In cases involving common funds, attorneys' fees have historically been calculated as a percentage *of the fund*. *See Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, October 8, 1985 (Arthur R. Miller, Reporter), reprinted in 108 F.R.D. 237, 258 (1985).

63. Empirical studies show that, regardless of whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third *of the recovery.* 4 NEWBERG ON CLASS ACTIONS § 14:6 at 551 (4th ed. 2002). If actual recovery by the class is truly the basis of attorney fees to be awarded in this case, $6,250,000.00 is a multiple of more than 3, not a fraction of "around one-third" of the most optimistically estimated actual recovery.

64. A fair method of awarding attorney fees in this case would be to award one-third of the total amount of refund claims *actually paid* to Authorized Claimants, as defined in the Proposed Settlement. <u>This amount is capped at $1,500,000.00</u>.

65. The *Staton* case bears directly on the question of attorney fees in this case, because, although the *Staton* parties sought to justify the attorney fee amount according to principles applicable to common funds, they actually constructed a hypothetical fund, or what the court called a "putative fund," which the court noted was "not properly viewed as a common fund as that term is used in attorneys' fees law." *Staton,* 327 F.3d 938, 966.

66. In *Staton*, "The parties portrayed the total fee award as 28% of the putative fund, and maintained that such a percentage is well within the percentage permitted under our common fund fee cases." *Id.* The *Staton* court, however, noted that the actual percentage award was much higher than the 28% the district court recognized, "because the value of the putative fund was enhanced by the court's inclusion of an estimated value of $3.65 million for injunctive relief." Pertinent to our case, the *Staton* court held:

> Precisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund. We hold, therefore, that only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees. *See Van Gemert*, 444 U.S. at 478-79, 100 S.Ct. 745.

*Staton,* 327 F.3d 938, 974.

67. Just as the *Staton* "putative fund" could not be inflated with the easily manipulable value of an injunction, so the non-existent "Common Fund" in this case should not be either inflated with the purported "value" of rebate coupons or other non-cash awards. It should also not include the maximum total of *possible* refunds because the Proposed Settlement assures that *actual* paid refunds will be rare, and those that do get paid will be inadequate.

68. The *Staton* court also rejected the parties' attempt to incorporate into the settlement an amount of fees calculated *as if* there were a common fund as an integral part of the settlement agreement, finding that such a ruse "allows too much leeway for lawyers representing a class to spurn a fair, adequate and reasonable settlement for their clients in favor of inflated attorneys' fees."

69. The *Staton* court held that

> The parties to a class action may not include in a settlement agreement an amount of attorneys' fees measured as a percentage of an actual or putative common fund created for the benefit of the class. Instead, in order to obtain fees justified on a common fund basis, the class's lawyers must ordinarily petition the court for an award of fees, separate from and subsequent to settlement.

*Staton,* 327 F.3d 938, 946.

70. In order for attorneys to obtain an award of fees from a common fund, the court must be able to: (1) sufficiently identify the class of beneficiaries; (2) accurately trace the benefits; and (3) shift the fee to those benefitting with some exactitude. *Staton,* 327 F.3d 938, 973, citing *Boeing Co. v. Van Gemert*, 444 U.S. 472 at 478-79 (1980). "[T]he criteria are satisfied when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf," whereas they are not satisfied when "litigants simply vindicate a general social grievance." *Id.* at 479, 100 S.Ct. 745.

71. The class members in this case are not identified ("not feasible" according to BSN Counsel, in his letter to the Attorney General of Texas, Exhibit C).

72. The benefits are not and cannot be traced, nor does the Proposed Settlement suggest any method of doing so except to assure that no claimant exceeds a cap of $30 for refunds or $50 per year in redeemed "rebate coupons." The rebates and discounts are targeted at BSN's market at large, not the Settlement Class.

73. The only exactitude in shifting the fee is the amount to be paid to Class Counsel; its allocation among class members, and the cost to the class, are not addressed in the Proposed Settlement. Thus, under *Staton*, the Proposed Settlement does not allow this Court to apply a common fund theory for awarding attorney fees, even if counsel had separated the petition for attorney fees from the Proposed Settlement, as required by *Staton*.

74. Even if class members in our case "redeem" the rebate coupons by paying more for the product than the face value of the coupons, the value of these coupons *to the class* must be calculated as close to zero. *Strong v. Bellsouth Telecomm., Inc.*, 173 F.R.D. 167, 172 (W.D.La. 1997) ("Neither the true economic value of an offered credit to its recipient, nor the true economic cost to its issuer, is equivalent to its face value. If it were, a newspaper containing $10 worth of

coupons would be as valuable as a $10 bill.") The theoretical value of all redeemed coupons to BSN, though significantly larger than the actual value to the class, is not relevant to the attorney fee calculation.

75. The sole "deterrent" effect of this litigation is that BSN will have to pay attorney fees to Class Counsel, even though the Proposed Settlement produces scant benefits to the Settlement Class and strips Class Members of the chance of ever making a valid claim against BSN for an actual refund. Six and a quarter million dollars is the largest dollar award in the Proposed Settlement that is not contingent on the occurrence of improbable events.

76. If the attorney award calculation is based at all on the alleged "value" of the Proposed Settlement to the Settlement Class, the award should be zero. Under *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002), incidental or non-monetary benefits conferred by the litigation are a relevant circumstance in adjusting a lodestar award upward. The absence of non-monetary benefits should likewise be considered in adjusting a lodestar award downward. A court may assess a negative multiplier for poor performance of counsel. *In the case of In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48 (E.D. Pa. 1983), judgment aff'd in part, rev'd in part on other grounds, 751 F.2d 562, 17 Fed. R. Evid. Serv. 222 (3d Cir. 1984).

77. $6,250,000.00 is not a percentage of the actual recovery obtained for the Settlement Class, it is a hefty quadrupling of the maximum theoretical recovery, though there is only a remote risk of the Settlement Class receiving that maximum benefit.

78. The Attorneys General respectfully ask that the Honorable Court reject this Proposed Settlement because it is unfair, unreasonable, and inadequate for class members.

Date: September 16, 2009

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

DAVID S. MORALES
Deputy Attorney General for Civil Litigation

DAVID C. MATTAX
Chief, Financial Litigation Division

ANN HARTLEY
Assistant Attorney General
Financial Litigation Division
State Bar # 09157700
PO Box 12548
Austin, Texas 78711
(512) 936-1313
FAX: (512) 477-2348
ann.hartley@oag.state.tx.us

This Brief is supported by the following:

Troy King,
Attorney General of Alabama

Daniel S. Sullivan,
Attorney General of Alaska

Dustin McDaniel,
Attorney General of Arkansas

Terry Goddard,
Attorney General of Arizona

John W. Suthers,
Attorney General of Colorado

Richard Blumenthal,
Attorney General of Connecticut

Stephen Levins,
Executive Director
State of Hawaii Office of Consumer Protection

Lisa Madigan,
Attorney General of Illinois

Tom Miller,
Attorney General of Iowa

Steve Six,
Attorney General of Kansas

Jim Hood,
Attorney General of Mississippi

Anne Milgram,
Attorney General of New Jersey

Gary King,
Attorney General of New Mexico

Catherine Cortez Masto,
Attorney General of Nevada

Richard Cordray,
Attorney General of Ohio

Drew Edmondson,
Attorney General of Oklahoma

Henry McMaster,
Attorney General of South Carolina

Marty J. Jackley,
Attorney General of South Dakota

Robert E. Cooper, Jr.,
Attorney General of Tennessee

William H. Sorrell,
Attorney General of Vermont

22

BRIEF OF ATTORNEYS GENERAL IN OPPOSITION TO PROPOSED CLASS ACTION SETTLEMENT

## EXHIBITS TO ATTORNEY GENERAL BRIEF IN OPPOSITION TO PROPOSED CLASS ACTION SETTLEMENT

*Exhibit A* - The National Association of Consumer Advocates *Class Action Guidelines - Revised*, 1590 PLI/Corp 285 (2007)

*Exhibit B* - Pages from the BSN Online web site on September 15, 2009 advertising the products at issue in this lawsuit, Cellmass, Nitrix, and N.O.-Xplode

*Exhibit C* - letter dated June 25, 2009 to the Attorney General of Texas, providing Notice pursuant to Section 1715 of the Class Action Fairness Act

*Exhibits D1 - D 6* - A Google search from the Internet on August 11, 2009, showing the first page of results from the search terms:

*Exhibit D1* - "BSN Settlement"

*Exhibit D2* - "BSN Class Action"

*Exhibit D3* - "BSN Lawsuit"

*Exhibit D4* - "BSN Supplements Lawsuit"

*Exhibit D5* - "BSN Class Action Settlement"

*Exhibit D6* - "BSN Settlement website"

*Exhibit E* - A Google search from the Internet on September 15, 2009, showing the first three pages of results from the "BSN Class Action" search

*Exhibit F* - BSN's press release dated December 14, 2007 regarding the BSN Class Action

*Exhibit G* - A Google search from the Internet on September 15, 2009 showing the first three pages of results from the "BSN Cellmass Lawsuit" search

*Exhibit H* - BSN's press release dated December 28, 2007, posted on the "Ironmagazine.com" web site

*Exhibit I* - A Google search from the Internet on September 15, 2009, showing the first three pages of results from the "BSN Nitrix Lawsuit" search

*Exhibit J* - BSN's online press release of dated December 14, 2007, posted on the "anonymousbodybuilding.com" web site

*Exhibit K* - A Google search from the Internet on September 15, 2009, showing the first three pages of results from a search of the terms "BSN + CEM3"

*Exhibit L* - Web page at "www.health-and-beauty.become.com/bsn-cem3" showing products that contain "BSN + CEM3"

*Exhibit M* - Web page at "www.bodyconcept.com/family/1114/display.html" showing products that contain "BSN + CEM3"

*Exhibit N* - Web page at "www.designerbodybuilding.com/bsn-nitrix-cem3-18..." showing products that contain "BSN + CEM3"

*Exhibit O* - Web page at "www.mmaoverload.com/bsn-nitrix-cem3-180-tabs.html" showing products that contain "BSN + CEM3"

*Exhibit P* - Web page at "www.amazon.com/cellmass-Grape-Cooler-CEM3-1-5..." showing products that contain "BSN + CEM3"

*Exhibit Q* - Web page at "www.shopwiki.com/BSN+CellMass+CEM3+1.41+lb" showing products that contain "BSN + CEM3"

*Exhibit R* - Web page at "www.nextag.com/bsn-nitrix-cem3/compare-html" showing products that contain "BSN + CEM3

*Exhibit S* - Web page at "www.bodyconcept.com/family/2491/display.html" showing products that contain "BSN + CEM3"

*Exhibit T* - Web page at "www.health-and-beauty.become.com/noxplode-cem3-bsn..." showing products that contain "BSN + CEM3"

0109840900285

Practising Law Institute
Corporate Law and Practice Course Handbook Series
PLI Order No. 11165
March-May, 2007

12th Annual Consumer Financial Services Litigation Institute

***285** NACA CLASS ACTION GUIDELINES--REVISED

Michael D. Donovan
Donovan Searles, LLC

Copyright (c) 2007 Practising Law Institute; Michael D. Donovan

***287 Biographical Information**

**Michael D. Donovan** is a founding member of the Philadelphia firm of Donovan Searles, LLC, and focuses his practice on securities and consumer class actions. He has served as lead or co-lead counsel in numerous securities and consumer class actions throughout the country. He has obtained a number of important appellate rulings, including a landmark Truth in Lending Act decision from the Court of Appeals for the Third Circuit in Rossman v. Fleet Bank (R.I.), N.A., 280 F.3d 384 (3d Cir. 2002), and landmark decisions from the Appellate Division of the New Jersey Superior Court and the New Jersey Supreme Court in Lemelledo v. Beneficial Finance Co., 674 A.2d 582 (N.J. App. Div. 1996), aff'd, 150 N.J. 255, 696 A.2d 546 (N.J. 1997). More recently, he obtained a $5.6 million jury verdict in a statewide consumer product defect class action entitled Samuel-Bassett v. Kia Motors America, Inc., (Phila. C.P. 2005); and a $78.6 million jury verdict in a statewide wage and hour class action entitled Braun and Hummel v. Wal-Mart Stores, Inc., (Phila. C.P. 2006). Mr. Donovan is the Co-Chair of the Consumer Law Subcommittee of the ABA Litigation Section's Class Actions and Derivative Suits Committee. He is also the former Vice Chair of the National Association of Consumer Advocates and an active member of Trial Lawyers for Public Justice.

***289 Table of Contents**

**GUIDELINE 1--THE PROPRIETY OF CLASS ACTIONS WHEN INDIVIDUAL RECOVERIES ARE SMALL** 
A. The Issue
B. Discussion
C. NACA Guideline
**GUIDELINE 2--SETTLEMENTS WHEN OTHER CLASS ACTIONS ARE ON FILE**
A. The Issue
B. Discussion
C. NACA Guideline

EXHIBIT
A

**GUIDELINE 3--CLASS ACTIONS INVOLVING HOMES**
A. The Issue
B. Discussion
C. NACA Guideline
1. Developing a Case
a) Narrowly Draft the Complaint
b) Consider Geographical Limits
2. Settlement Considerations
a) Consult with Lawyers Handling Individual Cases
b) Limit the Release
c) Preserve Defenses
d) Craft Creative and Comprehensive Settlements
e) Avoid Blanket Stays of Litigation
f) Include Stay of Foreclosure Proceedings and Illegal Conduct
g) Avoid the Use of Proof of Claim Forms
h) Make Class Notices Short and Understandable
i) Provide Mechanisms to Monitor the Settlement
j) Multi-District Litigation
**GUIDELINE 4--CERTIFICATE SETTLEMENTS**

A. The Issue
B. Discussion
C. NACA Guideline
**GUIDELINE 5--ADDITIONAL COMPENSATION TO NAMED PLAINTIFFS**
A. The Issue
B. Discussion
C. NACA Guideline
*290 **GUIDELINE 6--CLASS MEMBER BUYOFFS/RULE 68**
A. The Issue
B. Discussion
C. NACA Guideline
**GUIDELINE 7--*CY PRES* AWARDS**

A. The Issue
B. Discussion
C. NACA Guideline
**GUIDELINE 8--ATTORNEY FEE CONSIDERATIONS**
A. The Issue
B. Discussion
C. NACA Guideline
1. Fee Discussions During Settlement Negotiations
2. Percentage Benchmarks for Most Common Fund Cases
3. Issues Arising in Cases with Fee-Shifting Claims
4. Calculation of the "Fund" When Undistributed Amounts Revert to the Defendant
5. Notice to the Class of Intent to Seek Fees
6. Fees for Future Monitoring
**GUIDELINE 9--CLASS MEMBER RELEASES**
A. The Issue
B. Discussion
C. NACA Guideline
**GUIDELINE 10--CONFIDENTIALITY**
A. The Issue

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

B. Discussion
C. NACA Guidelines
**GUIDELINE 11--IMPROVED NOTICE OF SETTLEMENT**
A. The Issue
B. Discussion
C. NACA Guideline
**GUIDELINE 12--CLAIM FORMS**
A. The Issue
B. Discussion
C. NACA Guideline
1. The Appropriateness of Using Claim Forms
2. The Use of Claim Forms

**GUIDELINE 13--COMMUNICATIONS WITH CLASS MEMBERS (INCLUDING SOLICITING OPT-OUTS, AND CLASS LIST MARKETING)**
A. The Issue
B. Discussion
***291** C. NACA Guideline
**GUIDELINE 14--ROLE OF OBJECTORS**
A. The Issue
B. Discussion
1. Benefits of Meritorious Objections
2. Role of Objections in Competing Cases
3. Role of Class Counsel
4. Role of Greenmailers
5. Fees for Objectors
C. NACA Guideline
**GUIDELINE 15--ARBITRATION**
A. The Issue
B. Discussion
C. NACA Statement and Guideline
**GUIDELINE 16--MONITORING SETTLEMENT COMPLIANCE**
A. The Issue
B. Discussion
C. NACA Guideline

***293 GUIDELINE 1--THE PROPRIETY OF CLASS ACTIONS WHEN INDIVIDUAL RECOVERIES ARE SMALL**

**A. The Issue**

Questions are often raised whether some illegal business practices are inappropriate for class treatment because individual recoveries are too small to warrant individual actions and the attorney fees that are recovered dwarf the individual damages. Frequently, defendants propose that a class should not be certified because the relief to each class member is too small to warrant a class action.

From the standpoint of consumers and their advocates, class actions are essential to achieve the goals of consumer protection. Damages that are too small to make it possible to litigate an individual case can be combined in a class action to make meaningful relief possible.

**B. Discussion**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The argument in favor of considering relief to individual class members instead of the size of the total sum that the defendant will pay appears to be based on the conclusion that some recoveries to class members may be so trivial that they do not warrant redress.

Class action lawyers and other advocates hold the contrary view and believe that the focus on individual compensation misses a central point of class actions: deterring misconduct by the defendants. The class action device is particularly appropriate in consumer cases where individual recoveries are small, but that, in the aggregate, involve substantial sums, often millions of dollars in damages. Class actions serve an important purpose beyond simply compensating the injured. Often, class counsel and class representatives act as private attorneys generally vindicating cumulative wrongs, obtaining significant injunctive relief or institutional change, and requiring disgorgement of illegal profits. H. Newberg & A. Conte, NEWBERG ON CLASS ACTIONS §§5.49 & 5.51 (4th ed. 2002) [cited herein as "NEWBERG"]. Rejecting class actions because individual recoveries are small, while ignoring the aggregate amounts involved, encourages wrongful conduct and largely immunizes entities caught stealing millions in $10 increments.

An illustrative example is found in the consumer class actions challenging excessive late and over-limit charges on credit card accounts, which were criticized because class members "are eligible for only a few dollars apiece in compensation" while class counsel get "millions." Max Boot, WALL ST. J., Sept. 19, 1996. The proponents of the ***294** rejection of classes like this argue that when individual recoveries range from $5 to $50, a court should deem the amount to be trivial. Such a constricted view disregards the facts.

The Supreme Court has long recognized that without Rule 23, claimants with small claims would not be able to obtain relief. *See Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 338 n. 9 (1980), quoted above. To the same effect is *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985). "Class actions . . . may permit the plaintiffs to pool claims which would be uneconomical to litigate individually. For example, this lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available." *Id.* at 809. The 1966 Advisory Committee Notes to Rule 23 echo this concern: "These interests [in individual litigation] may be theoretical rather than practical: . . . the amounts at stake for individuals may be so small that separate suits would be impracticable."

More recently, the Supreme Court reaffirmed the availability of class actions for small consumer cases, in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), where it noted that in small stakes consumer cases common issues readily predominate. 521 U.S. at 624.Many federal and state courts cited *Amchem's* conclusion that common issues readily predominate in consumer class actions, and certified consumer classes, despite the existence of some individual issues. [FN1]

The availability of the class action remedy is particularly important with respect to consumer protection claims. As the Newberg treatise explains:

> The desirability of providing recourse for the injured consumer who would otherwise be financially incapable of bringing suit and the deterrent value of class ***295** litigation clearly render the class action a viable and important mechanism in challenging fraud on the public.

NEWBERG at § 21.30. S*ee also Watkins v. Simmons and Clark, Inc.* 618 F. 2d 398, 404 (6th Cir. 1980) (Class action certifications to enforce compliance with consumer protection laws are "desirable and should be encouraged.")

The simple fact is that no private lawyer will accept a case for $50, $500, or often even $5,000 in recoverable damage, because dilatory defense tactics will force attorney fees that are a significant multiple of the plaintiff's possible recovery and many courts will not adequately compensate a contingent-fee lawyer in such a situation.

In addition, assuming that it is desirable for a court to weigh the potential "costs" of class action litigation against its potential "benefits," it would be a mistake to focus solely on monetary relief recoverable as damages or restitution. Rather, many consumer class actions provide an additional social benefit--deterrence. Recovering a significant aggregate sum from a defendant will deter similar wrongful practices in the future by that defendant and by other similarly situated entities. This deterrent exists regardless of the amount recovered by individual class members. Moreover, injunctive relief can specifically prohibit resumption of a wrongful activity.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Judge Richard Posner put it succinctly: "The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative--no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied--to no litigation at all." *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

The importance of deterrence in consumer cases is shown by the frequency with which Congress and the state legislatures have included fee-shifting provisions in consumer protection statutes. By shifting fees, Congress and the state legislatures encourage enforcement of consumer laws through a system of "private attorneys general," even where the amount of damages at stake would be too small to support litigation if the plaintiff had to absorb the cost of attorney fees. *See, e.g., De Jesus v. Banco Popular de Puerto Rico*, 918 F.2d 232, 234 (1st Cir. 1990) (construing the Truth in Lending Act). This recognition of the importance of enforcing consumer protection laws, even in cases where the amount of damage to an individual consumer is small, is at ***296** least as applicable in the class action context as in the individual case context.

NACA strongly believes that one small claims consumer class action that provides real relief to thousands of consumers will always be superior to the theoretical potential to litigate thousands of individual small lawsuits. Such a theoretical potential will never become a reality when the individual claims are small. In our society, consumers engage in far more economic transactions than previously and do so with nationwide or regional companies using take-it-or-leave-it standardized forms, contracts, and sales methods. To combat abuses in these practices, class actions continue to be essential.

Using class actions to deter widespread consumer fraud may be better than the only practical alternative: punitive damage awards. If small compensation class actions are discouraged, the alternative will be to seek large punitive damage awards on behalf of a few consumers who, while litigating relatively small individual claims, can prove willful, wide-spread misconduct by defendants. While both alternatives may extract large payments from defendants, class actions distribute that payment to the victims, rather than providing relief to the few consumers who prevailed in their individual punitive damage claims.

In addition, the primary remedy sought in any small claims class action is often equitable in nature, making the payment of money to individual class members secondary to the far-more-valuable prospective relief.

Another argument against small claims class actions is the inefficiency of distributing small checks to many class members. In light of the development of automated systems and the availability of simple and inexpensive Internet claims processes, this supposed inefficiency becomes less urgent.

It becomes even less urgent when one considers that many of these cases involve an ongoing business relationship--credit card, banking transactions, and utility payments to name just a few instances--where the individual payment amounts can be determined based on the defendant's records and the ultimate payment made by credit to an existing account. No proof of claim is required, nor must the financial system process a number of small checks.

The most important consideration militating against opposition to small claims class actions is that the alternative--taking no action at all and thus permitting the defendant to get away with illegal behavior--is a far less positive result.

***297** Finally, what may seem "small" to those of us fortunate enough to be lawyers and judges may be significant to those consumers whose annual incomes are at or below the poverty level. A check for $100.00 represents one percent of the total annual poverty guideline allotment for one person under the United States Department of Health and Human Services 2005 poverty guidelines. 70 Fed.Reg 8373, 8374 (FeB. 18, 2005). For a low-income consumer, that "trivial" $100.00 individual recovery has significant value, equivalent, as a percentage of income, to a $1,000 recovery by a single person earning $100,000 a year.

While class actions, like any procedures, may sometimes be abused, protections against abuse already exist. Courts may and do refuse to allow classes to be certified where the potential recovery to each consumer is nominal or where a distribution would consume such substantial time and expense that the class members are unlikely to receive any appreciable benefit. *See e.g., Buchet v. ITT Consumer Financial Corp.*, 845 F. Supp. 684 (D. Minn. 1994); *Blue Chip Stamps v. Superior Court*, 18 Cal. 3d 381, 386 (1976); *City of San Jose v. Superior Court*, 12 Cal. 3d 447, 459 (1974). Further protections are found in the requirements that courts must find any settlements to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

be fair and reasonable to the members of the class, F. R. CIV. P. 23(e), and that courts must approve attorney fees.

The only comment that opposed small claims class actions came from an industry trade group, which limited its comments to debt collection class actions filed under the Fair Debt Collection Practices Act ("FDCPA"). The commenter concluded that a plaintiff would be better off filing an individual claim under the FDCPA rather than filing a class action where the damages are split between numerous plaintiffs. NACA does not agree with this comment because it fails to consider the curative nature of class actions--stopping that debt collector from harassing consumers in the future--as well as the economies of scale discussed above. The same commenter also opposed a class action based on what it termed an "inadvertent" violation of the FDCPA (such as failure to provide the federally required notice of rights), because it concluded that such a lawsuit would not have the desired deterrent effect because the violation was inadvertent. NACA disagrees with the commenter's conclusion that the failure to comply with federal law can ever be considered "inadvertent"--at best, it reflects a casual lack of interest in the debtor's rights under federal law. That commenter added, with respect to class certification, that the "court should look to the ***298** actual benefit to the plaintiffs, the alleged violation, and the effect of a class action upon the defendant debt collector as a condition of class certification." NACA does not believe that these substantive issues are relevant to consideration of a normal 23(b)(3) FDCPA lawsuit.

### C. NACA Guideline

Class actions are particularly appropriate in consumer cases where individual recoveries are small, but involve many thousands or millions of dollars in damages in the aggregate. This is precisely the type of case that encourages compliance with the law and results in substantial benefits to the litigants and the court. Denying class certification in such instances would unjustly enrich the wrongdoer, who would get to keep its ill-gotten gains. Class actions should be deemed appropriate because individual damages are too small to warrant redress without a class suit, so long as significant aggregate monetary or equitable benefits to the class are sought. This is especially true in cases with claims for which a legislative body has provided a fee-shifting remedy to encourage private enforcement actions.

Additional considerations favoring small claims classes are (1) availability of equitable relief as the primary goal, (2) increased use of automated payment systems to calculate and distribute individual damage amounts, and (3) the *cy pres* alternative to a truly inefficient distribution discussed in more detail in Guideline 7.

## GUIDELINE 2--SETTLEMENTS WHEN OTHER CLASS ACTIONS ARE ON FILE

### A. The Issue

Settling class actions when other similar cases are pending raises unique issues such as coordination of settlement discussion, reverse auctions, differing geographic issues, the substantive scope of the class, and pending or potential individual lawsuits.

### B. Discussion

This is one of the most complex issues in the Guidelines. There is general agreement that class counsel should be sensitive to the potential for wiping out claims asserted in other pending cases by settling a case, and should resist doing so. This problem is particularly apparent where the defendants suggest expanding a settlement class beyond the class definition contained in the complaint or in an earlier order certifying***299** a class, or expanding the claims settled, but offer no increased benefit to the additional class members or for settlement of the additional claims. [FN2] There is also concern about the filing of nationwide class actions and agreeing to settlements which do not exclude from the class, cases pending in certain states or locales. In either instance, the interests of the classes will not be well served by settlements that do not maximize benefits to class members.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion. Providing for a letter that supplements the class notice may alleviate some conflicts in the notice-writing process, as well.

If debt is forgiven as part of the settlement and that debt will be reported to the IRS, the class notice must advise class members as to the amount of forgiven debt that will be reported to the Internal Revenue Service and that there may be tax consequences. The notice must also state the importance of seeking tax advice and contain instructions to obtain tax assistance including a reference to the IRS sponsored Volunteer Income Tax Assistance (VITA) programs and the IRS toll-free number that class members can call to find a VITA program near them.

Class counsel should also mail a copy of the notice to local consumer lawyers and legal services offices who are known to represent individuals in actions against the defendants. Housing counselors and other entities that are involved in counseling class members in issues relating to the claims alleged in the class action should be notified as well.

***311 i) Provide Mechanisms to Monitor the Settlement**

Settlements should include specific mechanisms for the ongoing monitoring of equitable relief. Court or independent monitors are effective mechanisms to ensure compliance with broad-based equitable orders. [FN12] Defendants often appreciate the opportunity to have issues resolved by informal means rather than through adversarial contempt proceedings in separate actions. Class counsel should argue strenuously that all monitoring reports should be part of the public record. A point-person should be designated within the defendant's company, especially when litigating against national lenders, to answer future questions regarding the settlement, and to address special circumstances of individual class members. It may be advisable to include language in the settlement agreement stating that the court retains jurisdiction to enforce the settlement. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994).

The agreement should expressly allow class members to cite the settlement terms (and demonstrate any failure by defendant to comply with them) in later individual litigation between the defendant and a class member, including in defense to a foreclosure proceeding. Regardless whether the settlement terms specifically provide for it, if the defendant materially fails to comply with the terms of the settlement, class members may seek to intervene or otherwise seek to reopen the class action to enforce its terms.

**j) Multi-District Litigation**

Once a court orders multi-district litigation in a case that may result in the transfer of individual cases to a distant forum, class counsel should promptly seek court approval for a steering committee comprised of a reasonable number of attorneys representing individual homeowners. The purpose of the committee should be to provide representation of the individual interests in the decision-making of the lead counsel and to provide a conduit to the court when the interests of the individual homeowners differ from those of the class. Such committees are expressly permitted in the Manual for Complex Litigation § 10.221 (2005).



***312 GUIDELINE 4--CERTIFICATE SETTLEMENTS**

**A. The Issue**

Several years ago, there appeared to be a trend towards increased use of certificate settlements, offering relief to the class members in the form of certificates that are redeemable on future purchases from the defendant. These settlements came under increasing judicial scrutiny, including scrutiny spearheaded by NACA and the 1997 version of these guidelines. In some settlements, the value of the coupons was negligible or the coupons did little or nothing to address the alleged fraud. The issue of coupon class action settlements also became a political issue,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

with the State of Texas in 2003 passing a law requiring the attorney fees in class action settlements utilizing coupons to be paid in coupon. Tex. Civ. Prac. & Rem. Code § 26.003.

In 2005, Congress followed, requiring the setting of attorney fees in coupon settlements to be based upon the value of the coupons redeemed. 28 U.S.C. § 1712. Congress' rationale, expressed in the Act's findings, was that one of the abuses of the class action device was class action settlements where "counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value." 109 P.L. 2, 119 Stat. 4 (109th Cong. 1st Sess.).

Even before Congress' action, coupon settlements were decreasing as a result of increased judicial scrutiny. The seminal case and a good example of a coupon settlement that should never have been proposed for court approval is the General Motors ("GM") side-saddle pickup truck case. That class action sought to resolve a significant vehicle-fire safety hazard: exploding side-saddle gas tanks on GM pickups that killed many people and burned thousands. The plaintiffs alleged that the trucks were flawed by a dangerous and latent design defect--the placement of the gas tanks outside the frame rail--that increases the likelihood that their fuel tanks will rupture in side-impact crashes, causing fuel-fed fires. The class action sought a recall of these GM trucks, with restitution and refunds to all class members, and an order directing GM to pay for the retrofitting of all GM pickups to correct the fuel tank defects.

In the settlement, however, class counsel abandoned the recall/retrofit remedy in favor of an approach that limited class members' recovery to discount coupons to buy new GM trucks. There was no provision requiring GM to recall or repair the trucks, or to reimburse owners who made the repairs themselves, nor was there any provision requiring GM ***313** to warn consumers about the hazards of the trucks, despite the demand for such relief in the complaint. In other words, nothing in the settlement addressed the animating principle of this lawsuit: that these GM pickup trucks posed a serious--but remediable --safety hazard.

The settlement was criticized and rejected by both federal and state courts. *In re: General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3d Cir.); *cert. denied*, 116 S.Ct. 88 (1995); *Bloyed v. General Motors Corp.*, 881 S.W.2d 422, (Tex. App.-- Texarkana 1994), *aff'd, General Motors Corp. v. Bloyed*, 916 S.W.2d 949 (Tex. 1996). One of the criticisms was that the certificates were inadequate as the sole redress for the injured class members.

The GM case, and others, served to demonstrate the problems inherent in non-cash coupon settlements. In the years after the GM case, courts began demanding more stringent class protections.

"Coupon" settlements must be distinguished from other forms of relief that do not actually deliver dollars into the hands of the class but which may be entirely appropriate. For example, credits to existing accounts are usually adequate substitutes for mailing checks to each class member; indeed, crediting accounts is more efficient than mailing and the savings should be passed on to the class members through larger distributions. Similarly, if the amounts available to each class member are so small as to make delivery by checks not economically viable or if the class members are impossible to determine with certainty, distribution of the class benefit through *cy pres* awards is advisable, as discussed in Guideline 7. The comments below are directed solely to certificate settlements that only offer class members the opportunity to purchase a product or service from the defendant in the future at a claimed discount from the regular price to the consumer.

**B. Discussion**

Aside from the effect of 28 U.S.C. § 1712, which was intended to, and probably will, cause counsel to be wary of coupon class action settlements, the considered view today is that unless a coupon settlement provides increased benefits to class members and possesses certain safeguards, they should generally be avoided for the following reasons:

1. Except in unusual circumstances, there is usually no principled reason why delivery of cash settlements cannot be achieved, aside from the fact that the defendant prefers not to do so.

***314** 2. For most of the class, redemption may not be an option, because they are unwilling or unable to make a future purchase from the defendant. Thus the class members are not equally compensated--some get

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

more, others get less. This situation is at its most aggravated when the certificate requires purchase of a new car or other "big ticket" item.

3. Even where the coupon is for a small ticket item or is freely transferable, the defendant may be able to use its specialized knowledge of the industry to recover the cost of the coupon in the marketing of the relevant product.

4. Policy considerations disfavor rewarding the wrongdoing defendant with new sales from the victims of its illegal practices.

Proponents of certificate settlements point to benefits that can be obtained from coupon settlements that can, in some instances, provide benefits to classes that would support entering into one. Defendants may be willing to settle for coupons whose actual value to the class is greater than a cash settlement the defendant might otherwise make. This is because coupons can provide benefits to a defendant--the defendant obtains increased sales, a chance to re-establish brand loyalty, lower administrative costs when the settlement otherwise might require a claims review, or a delay of settlement payments until the future. Classes can benefit by additional consideration or by avoiding the inconvenience of having to fill out and submit claim forms. Such settlements may also make sense where the individual cash recovery may be so small that it is exceeded by the costs of the cash distribution and, therefore, a greater coupon value or coupon distribution could be the most (if not the only) effective way to provide the class with benefits. Finally, certificates may be all that an impoverished defendant may be able to provide. Thus, particular facts involved in a proposed certificate settlement may justify it, such as one case [*In re Sears Automotive Center Consumer Litigation*, (N.D. Cal. No. 92-2227 RHS)], where proponents averred that the certificates involved could be redeemed for any merchandise sold at Sears stores (not merely the services and merchandise at issue in the litigation) and that 99.6% of the certificates issued were redeemed.

**C. NACA Guideline**

Certificate settlements have many disadvantages and should be proposed by class counsel only in the rare case. Any such settlements ***315** embolden defendants to try to obtain them in other cases and thereby adversely affect the ability to obtain monetary relief in other cases. Congress' finding that they can constitute an abuse appears well founded. Nonetheless, the rare instances do exist where they may be appropriate or add value to a settlement that otherwise could not be obtained for a class. Such instances include: (1) if the primary goal of the litigation is injunctive and the defendant agrees to an injunction, or the certificates are good for the purchase of small ticket consumable items which class members are likely to purchase, or the certificates represent true discounts that would not otherwise be available, (2) where the certificates are freely transferable, (3) where the coupons are in addition to and can be added to any already-existing coupons or sales incentives, (4) where the coupons should be stackable (i.e., a consumer can use more than one in a transaction); and (5) where there is a market-maker to insure a secondary transfer market. Conversely, even if, for example, a market-maker cannot be obtained or established as part of the settlement, a coupon settlement provisions prohibiting a market maker should be unacceptable. A few additional basic positions are clear:

Certificate-based settlements should rarely, if ever, require identifiable class members to purchase major, large ticket items from the defendant as the sole significant relief to the class, and any such settlement involving a large ticket item certainly must require the coupon to have the protections set out immediately above, including transferability and the ensuring that a market maker will be available.

Certificates should have some form of guaranteed cash value. For example, the certificates could have a lesser cash redemption value (either upon issuance or within a reasonable period of time) that still gives the class members a benefit that is significant in relation to the actual damages which would be provable at trial. Less-preferably, the defendant could contract with a market maker that would promise to purchase all available certificates for a set price that is significant in relation to the likely recovery at trial.

Certificate settlements should never be proposed to the court unless it is apparent that the defendant is providing greater true value (*i.e.*, not just the face value of the certificates or their potential value) to class members than would be available from an all-cash settlement. Even though there may be legitimate tax or financial-account-ing

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

reasons why a greater recovery for class members can be had from a non-cash settlement, class counsel should inquire about defendants' reasons for ***316** preferring a noncash settlement, as well as inquire as to any already-extant or planned coupon proposals or pending sales initiatives. The beginning assumption should always be that defendants prefer non-cash to cash settlements because they believe the true value to be less. Since defendants will usually be in a superior position to predict the ultimate redemption rate and benefit to the class, their preference for a non-cash settlement should be viewed with skepticism.

A settlement involving certificates should require a minimum level of redemption by the class members within a reasonable period of time. If actual redemption does not meet this minimum level, the defendant should provide alternative relief in the form of a common fund or, as has been done in some case, a second release of additional coupons, perhaps printed in a newspaper as, in effect, a fluid recovery mechanism.

Consideration should be given to providing coupons for multiple goods, not just the goods at issue in the case. Particularly with consumer products, a coupon good for several different products is usually far more valuable to the class and more likely to be redeemed.

Class counsel and defendants should submit to the court and all counsel of record detailed information about redemption rates and coupon transfers during the entire life of the coupon. By doing so, a public record will be made of what works and what does not work in non-cash settlement cases.

## GUIDELINE 5--ADDITIONAL COMPENSATION TO NAMED PLAINTIFFS

### A. The Issue

Serving as a class representative generally requires significantly greater effort, and sometimes greater risk, than is required of the absent class members. In addition, the class representative's willingness to serve in that capacity enables the litigation to be brought in the first place. This Guideline addresses the considerations applicable when class counsel seeks court approval of additional compensation to a class representative beyond the representative's *pro rata* share of settlement proceeds. [FN13]

### B. Discussion

Early cases reflect a view that it is a conflict of interest for named plaintiffs to receive anything more than their proportionate share of ***317** damages in amounts which are equal to those received by absent class members. The theory was that named plaintiffs, like class counsel, are fiduciaries to the class, and should not benefit from class litigation to any extent not shared by all similarly situated class members. Similar concerns presumably underlie the apparent prohibition upon such awards in private securities cases. *See*, 15 USC §78u-4(a)(4) (1995). *But see, Great Neck Capital Appreciation Inv. P'Ship, L.P. v. Pricewaterhousecoopers*, 212 F.R.D. 400, 412 (D. Wis. 2002) (approving incentive awards in securities case).

Most recent decisions, however, have approved the incentive award payments to named plaintiffs in recognition of their efforts in achieving the results obtained. Many cases note the obvious public policy reasons for encouraging individuals with small personal stakes to serve as class plaintiffs in meritorious cases. *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998); *In re Cendant Corp.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002); *Van Vraken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 300 (D. Cal. 1995) (listing factors). These cases are based on the fundamental premise that named plaintiffs undertake obligations, provide input and take risks not shared equally by absent class members, thus justifying different treatment.

The amounts awarded in reported cases vary widely from token payments to amounts in the tens or--rarely--even hundreds of thousands of dollars. *See e.g., Fears v. Wilhelmina Model Agency, Inc.*, 2005 U.S. Dist. LEXIS 7961, 9-10 (S.D.N.Y. 2005) (approving incentive awards of $25,000 and $15,000; noting cases approving awards as low as $336 and as high as $303,000 with most awards being in the $10,000 to $50,000 range).

Many commenters argued that modest incentive payments should be made routinely available in class cases in recognition of the fact that class representatives are voluntarily assuming extra responsibilities beyond those of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**B. Discussion**

The use of offers of judgment posed an inherent threat to the nature and efficacy of class actions, particularly consumer class actions where any individual's damages could be relatively modest. While Proponents of Rule 68 asserted that they were merely utilizing the law as it stood and that a class action was a procedural, not substantive, device that there was a distinct threat to the class action mechanism would appear difficult to dispute. It was recognized, for instance, by the Supreme Court in *Deposit Guar. Nat. Bank v. Roper*, 445 U.S. 326, 339, 100 S. Ct. 1166, 63 L. Ed.2d 427 (1980), where the Court recognized the issue, "Requiring multiple plaintiffs to bring separate actions, which effectively could be 'picked off' by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions; moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement." On the other ***320** hand, however, there are occasions where no real class may exist and the case was brought as a class action due to a mistaken understanding or even as a mechanism to obtain a higher putative value for the case from the outset.

Case law had long recognized that offers of judgment was improper, at least where a motion for class certification had been made. *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 546-47 (7th Cir. 2003); *Greisz v. Household Bank*, 176 F.3d 1012, 1015 (7th Cir. 1999); NEWBERG at § 15.36 (4th ed. 2002). The incentive created thereby to avoid offers of judgment by rushing to move for class certification left unanswered the propriety of an offer of judgment before a motion for certification. This was resolved by the Third Circuit in *Weiss v. Regal Collections*, 385 F.3d 337, 348 (3d Cir. 2004), where the court held that "[a]bsent undue delay in filing a motion for class certification, therefore, where a defendant makes a Rule 68 offer to an individual claim that has the effect of mooting possible class relief asserted in the complaint, the appropriate course is to relate the certification motion back to the filing of the class complaint." It is commonly recognized that this decision probably resolves the debate and practitioners report that the more reputable and experienced defense counsel are no longer attempting to make Rule 68 offers.

**C. NACA Guideline**

NACA believes that to avoid continued unproductive litigation in this area courts should not merely reject offers of judgment in the context of class actions (at least until class certification has been denied) but should affirmatively recognize the impropriety of such offers where they are used as a mechanism to subvert and derail class actions. That a putative class representative can reject such an offer now appears to be juridically clear.

Except when it is apparent that no class could be certified, NACA also believes that putative class counsel should counsel the client against accepting an offer of judgment made to a putative class representative before a decision on a motion for class certification. Acceptance of such offers will only tend to encourage defendants to continue making such offers.

***321 GUIDELINE 7--*CY PRES* AWARDS**

**A. The Issue**

Often, not all class members can be located to receive their pro rata share of a damage award. What happens to the undistributed residue? Are there circumstances under which the residue should revert to the defendant? Under what circumstances is a *cy pres* distribution of all or part of the settlement fund appropriate? What is class counsel's role in recommending recipients of such awards?

**B. Discussion**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

A *cy pres* distribution occurs when funds from a settlement or judgment that belong to the class are distributed instead to organizations for the benefit of the class. [FN14] A related alternative distribution method is fluid recovery (also called rolling restitution) where there is no direct payment to the class or to an organization, but rather the defendant agrees to some form of price reduction in the future. For example, if a fast food company were sued for charging excess sales tax, a *cy pres* distribution could consist of a payment of an amount to a food bank. A fluid recovery in the same case could consist of the company reducing the price of all its food products for a sufficient period of time to all its customers to recoup the tax overcharges prospectively. This Guideline will discuss some fluid recovery cases, but is focused on cy pres distributions.

Commenters unanimously agreed that *cy pres* remedies are appropriate to ensure that undistributed residues are used to provide indirect benefit to absent members of the plaintiff class or to further the purposes of the statutes that formed the basis for the underlying litigation.

NEWBERG discusses the policies behind *cy pres* awards and concludes that *cy pres* distributions can be an appropriate exercise of the court's general equitable powers. NEWBERG, §10.16 *et seq.*

NEWBERG's conclusion is supported by the case law. E.g., *Bebchick v. Public Utilities Commission*, 318 F.2d 187 (D.C. Cir. 1963); *In *322 Re Agent Orange Product Liability Litigation*, 818 F. 2d 179, 185 (2d Cir. 1987); *State of West Virginia v. Chas Pfizer Co.*, 314 F. Supp. 710, 728 (SDNY 1970), *aff'd*, 440 F.2d 1079, 1083 (2d Cir. 1971); *Simer v. Rios*, 661 F.2d 655, 676 (7th Cir. 1981); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F. 2d 1301, 1307 (9th Cir. 1990); and *Nelson v. Greater Gadsden Housing Authority*, 802 F.2d 405, 409 (11th Cir. 1986).

The Second Circuit opinion *In Re Agent Orange Product Liability Litigation* is particularly worth noting. The Court concluded that a district court may set aside a portion of settlement proceeds for programs designed to assist the class in order to maximize the beneficial impact of the settlement fund on the needs of the class. The Court distinguished its earlier decision in *Eisen v. Carlisle & Jacquelin,* 479 F. 2d 1005 (2d Cir. 1973) ("*Eisen III*"), *vacated and remanded on other grounds*, 417 U.S. 156 (1974), which reversed a trial court order allowing fluid recovery by reducing prices. The court explained that the fluid recovery at issue in *Eisen III* would have allowed plaintiffs to satisfy the manageability requirements of Rule 23 where they otherwise could not and would result in a greatly increased number of doubtful but astronomical class claims in the federal courts. That concern was not present in *Agent Orange*, which was maintainable as a class action regardless of the form of recovery available to the plaintiff class. *In Re Agent Orange Product Liability Litigation, supra*, at 185.

State courts have also approved *cy pres* remedies. The propriety of *cy pres*, including creation of a consumer trust fund, was recognized by the California Supreme Court in *State of California v. Levi Strauss,* 41 Cal. 3d 460 (1986). The court concluded that *cy pres* awards are appropriate where there is a nexus between the proposed use of the fund and the class on whose behalf the case was litigated, or where the proposed use furthers the purpose of the statutes that formed the basis for the underlying suit. *Id.* at 472-473. *See, also, Boyle v. Giral*, 820 A.2d 561, 569 fn. 8 (D.C.C.A. 2003). [FN15] The rationale for *cy pres* awards is further explained in McCall, Sturdevant, Kaplan, and Hillebrand, "Greater Representation for California Consumers--Fluid Recovery, Consumer Trust Funds, and Representative Actions," 46 Hastings Law J. 797 (1995). Thus, the law supports *cy pres* remedies in cases that are litigated to conclusion.

In the settlement context, it is clearly permissible to settle with defendants and include a *cy pres* provision in the agreement, because a defendant may agree to a settlement that provides for *cy pres* notwithstanding***323** the *Eisen III* rule discussed above. *Beecher v. Able,* 575 F. 2d 1010, 1016 n. 3 (2d Cir. 1978).

There are two views on allowing residues to revert to defendants. One view considers that an alternative that would reward defendants for engaging in wrongful conduct is unacceptable, except where there are no ill-gotten gains to be disgorged. The other is that it is appropriate where there is no incentive for defendants to fail to distribute the damage award or to assist in locating absent class members because allowing the return of the residue may enable counsel to negotiate better relief to known class members and obtain an agreement as to injunctive relief.

There are also two divergent views on the propriety of *cy pres* awards of the entire damage fund with no distri-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

bution to the class. One view is that counsel's fiduciary duty to the members of the class requires that there must always be a direct distribution to class members, and only the undistributed residue used for a *cy pres* remedy. The other view is that where individual recoveries are unduly costly to distribute or too small to warrant the cashing of checks, *cy pres* awards of the entire damage fund is appropriate. One commenter said that traditional *cy pres* payments should only be made when the funds cannot be sensibly distributed to class members. This commenter gave an example of a settlement where the class members received direct payments, but there was also an initial *cy pres* distribution. In that instance, the class members could have been paid the amount in the *cy pres* fund. This commenter questioned whether it was possible to reconcile such an initial *cy pres* distribution with the theory of *cy pres* as being the next best alternative to direct distribution.

There is authority for using a *cy pres* remedy for the entirety of a statutory damage award when the amount of damages to each class member is too small to warrant distribution. ***324** *Gammon v. GC Services Ltd. Partnership*, 162 F.R.D. 313 (N.D.Ill. 1995), was a suit under the Fair Debt Collection Practices Act involving a proposed class of four million people, each of whom would be entitled to 13 cents if plaintiffs prevailed. Class counsel, moving to certify the class under Rule 23(b)(2) of the Federal Rules of Civil Procedure, suggested *cy pres* distribution of the entire damage award. The defendant did not dispute the propriety of this remedy, which the court assumed would be suitable. Citing NEWBERG, the court noted that class actions are designed not only to compensate individuals who have been harmed, but also to deter violations of the law, especially when small individual claims are involved. It concluded: "Disgorgement of illegal gains from wrongdoers, together with ... application of the recovery for the benefit of class members under *cy pres* doctrines, would fulfill the deterrence objectives of class actions." *Id.* at 321, quoting NEWBERG, §4.36. (Note that in *Mace v. Van Ru Credit Corporation,* 109 F.3d 338, 345 fn. 5 (7th Cir. 1997), *Gammon* was limited to its own unique facts.)

More recently, the court of appeals for the District of Columbia held that *cy pres* "distributions, including the entire amount of the consumer settlement fund rather than just the residue, are being used or advocated increasingly where direct distribution of settlement funds to individual class members is impractical; and where important consumer goals, such as disgorgement of ill-gotten gains from and deterrence of future over-pricing and manipulation of market allocation by the offending entities, can be achieved." *Boyle v. Giral*, 820 A.2d 561, 569 (D.C.C.A. 2003).

There is agreement that it is the duty of class counsel to recommend *cy pres* recipients. In addition, commenters suggested that, because *cy pres* funds are by definition property of the class as a whole, participation of the defendant in the selection of the *cy pres* recipient raises serious problems. One commenter stated that he could not envision any circumstance in which it was appropriate for a defendant to participate in the selection process. However, another commenter said that a recipient that meets with the defendant's approval could result in greater monetary benefits for the recipients.

It is quite true that many defendants (1) do not want worthy and effective organizations to get the money to do good work, (2) prefer to see the money go to non-controversial uses, (3) too often, will attempt to have the funds allocated to organizations it controls or already supports (which gives the defendant impermissible control over the *cy pres* and dilutes the benefit of the *cy pres* since the defendant is not adding ***325** new dollars for good purposes, but often merely taking credit for old dollars it already was committed to spend). [FN16] At a minimum, care must be taken to insure that no *cy pres* payments are proposed to any entity in which any defendant has any interest, financial or otherwise.

An advantage of the use of *cy pres* is that it often can serve as a substitute for a coupon-only settlement. Many commenters favor NACA's endorsement of a rule of thumb that says that when the relief to the class is quite small and when distribution would be economically inefficient, the better choice is to provide a significant *cy pres* payment rather than a *de minimis* check to each class member. Commenters have not been able to agree on the ceiling for this decision. Indeed, in some instances, $20 may be too little to warrant the effort while in other case, $10 may be enough.

Because it is the courts' role to protect the absent class members' interests, courts should carefully review the competence and record of organizations that are proposed as recipients. NACA believes that serious consideration should be given to using the unclaimed portion of the award for a long-term grant to an existing organization with competence in the issues raised in the underlying litigation. This will ensure that projects are of sufficient duration

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

to result in real and concrete benefit to absent class members.

One commenter added concerns that *cy pres* recipients might be chosen who could otherwise be objectors to the settlement, pointing out the inevitable conflict between the recipient's financial self-interest and its obligation to its members or constituents.

### C. NACA Guideline

In proposing a *cy pres* remedy, class counsel should propose a disposition of the unclaimed portion of the award that will either (1) protect the interests of the persons injured by the illegal conduct and thus indirectly benefit absent class members or (2) promote the purposes of the statutory prohibitions sought to be enforced in the underlying litigation. Class counsel should also insist that the recipients of the award ***326** be accountable to the court and should enter into memoranda of understanding to that effect with recipient organizations. [FN17] They should then monitor the recipients to insure that these goals are met. [FN18]

If class counsel wish to propose that a newly created organization receive the unclaimed funds, class counsel should be prepared to show the court how that organization has the ability and competence to work for the interests the underlying litigation sought to protect. This can be accomplished by providing information to the court about the current or proposed officers, directors, and staff of the organization. The work to be done by an existing or new organization should be set forth in a comprehensive proposal, together with time tables for accomplishing that work, which should indicate how the class will be indirectly benefited or the purposes of the underlying statutes will be furthered by these efforts.

Class counsel should insure that no *cy pres* payments are proposed to any entity in which any defendant has any interest, financial or otherwise.

Indeed, unless exceptional circumstances exist, the defendant should not have any role in the choice of the *cy pres* recipient. Instead, the class representative and class counsel should recommend a recipient of *cy pres* funds to the court, to be approved as part of the fairness hearing.

To ensure full accountability, counsel should insure disclosure of the details of the *cy pres* plan and the *cy pres* recipients as part of the notice to the class of any settlement, and should monitor the recipients to insure that they use the *cy pres* funds strictly in accordance with the terms of the court's order. For long term projects, counsel can oversee performance by requiring quarterly meetings with recipient organizations, semi-annual plans for work to be undertaken, and periodic reports of past accomplishments. Counsel should be entitled to compensation***327** for work necessary to monitor implementation of the *cy pres* remedy at standard rates, with no enhancement or multiplier.

Class counsel should insist on direct distribution of damages to class members before recommending a *cy pres* remedy for the undistributed residue except in unusual circumstances. These include instances where individual recoveries are unduly costly to distribute because, for example, defendants have no computerized records that would enable them to generate a list of class members' names and addresses, or where individual damages are too small to warrant the issuance, processing, and cashing of checks.

Class counsel should recommend *cy pres* remedies which will provide indirect benefit to absent members of the class or which will further the purposes of the underlying litigation. They should also recommend mechanisms which will provide for monitoring by class counsel, and, ultimately, judicial oversight of the expenditure of the funds.

## GUIDELINE 8--ATTORNEY FEE CONSIDERATIONS

### A. The Issue

The issue of attorney fees is important in class actions. If awards of attorney fees are too low, attorneys will not have the incentive to undertake, on a contingent basis, representing putative consumer class claims. The public policy goals, which include recovering money for consumers and deterring illegal conduct by defendants, fur-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

thered by worthy class actions cannot be achieved without the promise of fair and reasonable fee awards upon success. On the other hand, fee awards that are too high do not serve the best interests of the class members and some such awards have become the rallying point for criticism of class actions in general.

Considering attorney fees issues can be difficult and complicated because fee awards may be made on at least three different bases: statutory fee shifting, in which defendant pays the fee; awards from a common fund, in which the fees are paid out of the class members' recovery; and common benefit awards, in which the defendant pays the fee even in the absence of a fee shifting statute.

The prime focus of criticism is the size of the fees. In many instances, this problem is more apparent than real. For example, when the individual recovery is $50.00 per consumer, an attorneys' fee of $2 ***328** million might seem excessive at first glance. But if the total dollars actually recovered by the individual class members in such a case were $15 million, then fees are less than 14% of the total class recovery. This makes the fee reasonable with respect to the total recovery, which is the proper comparison. Criticism focused on a comparison between total fees and individual recoveries are either ill-informed or merely convenient cover for persons who oppose consumer class actions for other reasons.

But some criticism of excessive fees cannot be so easily dismissed. In particular, compelling criticism has been directed at cases in which the actual cash received by the class is minimal, if any, and the only other benefits received by the individual members are certificates of questionable value. The GM Pickup Truck cases, *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3rd Cir.), *cert. denied*, 516 US 824 (1995); *Bloyed v. General Motors Corp.*, supra, and the Broncó II case, *In re: Ford Bronco II Products Liability litigation*, 1995 WL 373061 1995 U.S. DIST. LEXIS 3507 (E.D.La.1995) (rejecting settlement of a class action challenging dangerous vehicles that provided relief to the class in the form of a flashlight and safety video but no damages) are well known examples, but this problem had its roots in earlier cases such as the airline antitrust settlement, which also provided certificates to consumers and millions of dollars in attorney fees to the class lawyers.

In 1997, NACA criticized settlements that tied attorney fees to the "face" amount of certificates, rather than the actual value to the class of such non-monetary relief. 176 F.R.D. at 398-399. The Advisory Committee Notes to the 2003 amendments to Rule 23 echoed that criticism, stating that settlements "involving non-monetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class." Similarly, 28 USC §1712, enacted in 2005, provides: "If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorneys' fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed."

**B. Discussion**

The fundamental goal for approaches to calculation of attorney fees in consumer class actions is to provide sufficient reward to motivate class counsel to bring worthy cases, while avoiding unnecessary and ***329** undeserved overpayment. There are a variety of proposed approaches, but there is no perfect solution. Differences of opinion exist about the basic method for calculating attorney fees, as well as the details of such a calculation.

One viewpoint holds that class counsel should be paid only by lodestar (*i.e.*, reasonable number of hours spent times a reasonable hourly rate), enhanced by multipliers when appropriate. The leading lodestar/multiplier cases are: *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974); and *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973), *on remand*, 382 F.Supp. 999 (E.D.Pa.1974), *rev'd on other grounds*, 540 F.2d 102 (3d Cir.1976) (*en banc*).

Generally speaking, this is the approach mandated when calculating a defendants' liability for fees in a "fee shifting" case, *i.e.*, where the statute sued upon provides that the losing defendant is required to pay the prevailing plaintiff's fees. The basic argument in favor of the lodestar/multiplier approach is that it provides for careful review of both the time claimed as reasonable and the hourly rates sought for that time. Proponents of this approach

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

also argue that it effectively matches reward to worthwhile effort and avoids windfalls in easy cases.

But there are disadvantages to the lodestar/multiplier approach: (a) The award of multipliers of the lodestar fee is inconsistent and depends upon the trial court's exercise of discretion. Therefore, adherence to the lodestar/multiplier approach could make some class actions impossible to bring, if the resources needed to commit to the litigation were so sizable that the only way a law firm could economically justify taking on the case, and running the risk of recovering nothing, would be assurance--if the case is successful--of the likelihood of recovery of a multiplier of the lodestar amount or the potential of a large percentage recovery; (b) Some commentators contend that the lodestar/multiplier approach provides no incentive for class counsel to perform work as efficiently as possible, instead inviting "churning," and to seek early settlement where available; and (c) The effort required of the parties in submitting, and the court in scrutinizing, the detailed evidence documenting all time spent and evidentiary support for hourly rates claimed is burdensome and often develops into time-consuming satellite litigation. *See generally*, "Court Awarded Attorney Fees," REPORT OF THE THIRD CIRCUIT TASK FORCE, 108 F.R.D. 237 (1985) ("1985 Third Circuit Report").

***330** The alternative method for calculating attorney fees in a class action case which recovers monetary relief (or its equivalent) for the class is to award an amount equal to a percentage of the total recovery obtained for the class members in the case. *See, e.g., Camden I Condominium Association v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) (percentage method required in common fund cases); *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993) (same). While the precise percentage varies by case, there is authority for presuming an award in the 20-30% range to be reasonable and appropriate in most cases. *See, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir.1989). *See also,* 1985 Third Circuit Report, *supra.* Proponents of this approach note that it keeps class counsel's financial interest closely aligned with that of the class itself, approximates the "free market" negotiated fees obtained in traditional contingency litigation (in which contingent fees of 33% to 40% are common), and avoids the disadvantages of lodestar/multiplier analysis noted above. In addition, proponents argue that the *possibility* of a large fee in comparison to effort required provides the necessary incentive for the risk-taking required of prospective class counsel when deciding whether to initiate difficult and expensive litigation with knowledge that --at best--no payment will be obtained for several years, and--at worst--no payment at all will be obtained if the litigation is unsuccessful.

Opponents of the percentage method contend that a standardized percentage approach (e.g., 20%-30%) results in overpayment in some cases, where either the effort required by class counsel was relatively modest or the size of the case was so large that even extensive efforts are overcompensated. More generally, those who advocate the lodestar/multiplier approach stress their preference that fee awards be based directly on an assessment of work done, rather than using an approach which does not do so.

Valuing the common fund, upon which a percentage may be based, also raises issues in some circumstances. Ignoring the difficulties which are inherent in valuing various forms of equitable relief, even a facially "simple" common fund may not necessarily translate directly into dollars in the pockets of class members. First there is the issue of "coupon settlements," in which the relief to the class is in the form of certificates which entitle class members to purchase a product or service in the future at a discount or at no charge. These problems, which were discussed extensively in the original version of these Guidelines, ***331** have largely been resolved by the 2003 amendments to Rule 23 and the 2005 enactment of 28 U.S.C. §1712.

One additional valuation issue remains. Many settlements are stated in total dollar amount available to the class, but provide that the unclaimed funds will revert back to the defendant. The amount of such reverting funds is likely to be higher where claim forms are required before class members receive their distribution, [FN19] but *some* amount of unclaimed funds will exist in almost any class action because many class members cannot be located with reasonable diligence. Whatever portion of the originally-available settlement is returned to the defendant arguably reduces the actual "fund" obtained by class counsel for the class. The case law is mixed regarding this issue. *Compare, Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 852 (5th Cir. 1998) (District Court did not abuse its discretion in setting lodestar-calculated fee award in light of actual payout excluding reversionary funds, noting that the case did not involve a true common fund but instead merely a pre-calculated maximum possible payout), *with Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (benchmark for fee award is 25% of entire fund, and District Court abused its discretion in basing award on actual

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

distribution to class); *Waters v. International Precious Metals Corp.*, 190 F.3d 1291, 1296 (11th Cir. 1999) (no abuse of discretion for District Court to base percentage on entire fund so long as it understood possibility of reversion; distinguishing *Strong*). *See also, International Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000) (Statement of Justice O'Connor). Proponents of the "gross recovery" approach argue that the total amount made available to the class is a result of counsel's efforts and therefore, should be the basis for any percentage recovery. Opponents argue that the monetary value achieved for the class is represented by the amount paid to class members, not the amount theoretically available. Opponents also express concern that class counsel will not have the financial incentive to argue against unnecessary (or unnecessarily complicated) claim forms if payment is not dependent upon the amount actually paid to class members. The Advisory Committee Notes to the 2003 amendments to Rule 23, subd. h, suggest that courts examine the extent to which claims procedures result in actual payout to the class, but does not squarely take a position on this conflict among the circuits.

***332** The interaction between the lodestar/multiplier and percentage approaches is sometimes complex. In many federal circuits, the district court has discretion to choose between the lodestar/multiplier or the percentage method. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047, 1050 (9th Cir. 2002); *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241 (8th Cir. 1996). Some circuits express a "preference" for the percentage method in common fund cases, but permit the trial court to exercise discretion contrary to that preference. *See, e.g., Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994) (percentage of the fund method preferred in common fund cases, but either method permissible).

A recent trend in some federal courts has been to use the lodestar/multiplier approach (or some variant) to cross-check the reasonableness of a dollar amount reached via the percentage method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047, 1050 (9th Cir. 2002); *In re Cendant Corp. Litig.*, 264 F.3d 201, 285 (3d Cir. 2001) (noting that use of lodestar/multiplier analysis to cross-check is time-consuming, and advising that other factors be used to assess reasonableness where feasible). While this may perhaps avoid windfalls in individual cases, a "blended" approach would seem to undermine one of the purposes of the percentage of the fund method of calculating fees, *i.e.* the possibility of a large fee relative to effort required as an incentive to undertake difficult and risky cases. It also is inconsistent with the observed results of the free market in individual contingent cases, which generally provide for set percentages based solely on client recovery. *Cf., In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (ultimate goal in awarding class counsel fees is to match as closely as possible the "market rate" for legal services in the case). One commenter argued, however, that the 20%-30% range for percentage awards is arbitrary, merely reflecting historical court awards, since there is no actual "market" for class counsel representation. This commenter believes that a lodestar crosscheck is necessary if such percentages are to be the starting point for fee awards.

A complicating factor is that it is not always clear whether a case is a common fund, a fee-shifting, or a common benefit case. Which category (or categories) the case falls into may have implications for the potential recovery of fees from the defendant and the optimal method for calculating class counsel's fees. It is important to note that these alternative bases for awarding fees are not necessarily in conflict: fees could be recovered from the defendant under a fee-shifting statute or ***333** other theory and paid into the common fund, with class counsel receiving a percentage of the resulting total recovery. This approach finds support in *Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir.1988), which involved the settlement of statutory fee shifting claims. The court noted that a settlement merges all claims, including the client's statutory fee shifting claim, into one common fund that belongs to the class clients, and ordered fees to be calculated under common fund principles. This view is also consistent with case law noting that the amount that an opposing party can be required to pay as a "reasonable" fee may be substantially less than a reasonable fee owed by the client (or class of clients). *Venegas v. Mitchell*, 495 U.S. 82, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990).

Whatever the method used to calculate fees, any contingent fee award must take into account the difficulty, complexity, and the risk of the case, the relief obtained for the class, and the delay in payment, as well as the fact that some cases will result in no fee at all. Therefore, it is entirely appropriate in most class action cases to award fees that are in excess of a fee calculated solely on an hourly basis without any multiplier. This concept is expressly stated in cases such as *Fischel v. Equitable Life Assurance Society Of The United States*, 307 F.3d 997, 1008 (9th Cir. 2002) ("[i]t is an abuse of discretion to fail to apply a risk multiplier, however, when (1) attorneys

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky."). *See also, Vizcaino v Microsoft*, 290 F.3d 1043 (9th Cir. 2000), *cert. denied sub nom., Vizcaino v. Waite*, 154 L. Ed. 2d 425 (2002) (survey of many decisions in which they are granted demonstrates that multipliers between 1 and 4 are the norm in common fund cases).

When a fee is to be calculated on a percentage basis, there is no fixed percentage that is appropriate to all cases, though the vast majority of awards fall within the 20%-30% range. Some commenters and case law urge a "sliding scale" approach to percentage awards, i.e., the percentage awarded should be smaller when the class recovery is unusually large. But this view is controversial. *See, In re Cendant Corp. Litig.*, 264 F.3d 201, 284 (3d Cir. 2001) (citing conflicting authorities and noting argument that this approach provides an incentive to "settle cheap"). On the other hand, there are also cases where a percentage award in the "normal" range may be unreasonably low, for example, in a case where the primary relief obtained is a significant ***334** injunction, with relatively modest monetary recovery for the class. The equitable relief might, in a particular case, justify a fee that far exceeds 30% of the monetary component of the recovery.

A distinct question, unrelated to the fee-calculation method, arises when class counsel negotiates a settlement. Simultaneously negotiating class relief and attorney fees for class counsel creates a potential conflict of interest. *In re GMC Pick-Up Truck Fuel Tank Prods. LiabLitig.*, 55 F.3d 768, 804 (3d Cir. 1995). Some commenters argue that there is an inherent problem with negotiating fees with opposing counsel, even when counsel have first agreed on relief to the class. Because the Court has an independent duty to examine the fees, these commenters feel, early agreement does little but create the appearance of collusion between class counsel and the defendant. *See Waters v. International Precious Metals Corp.*, 190 F.3d 1291, 1293 (11th Cir. 1999). Others contend that settlement often would be impossible to achieve unless the defendants understand the extent of their total exposure, and urge that that there is no reason not to reach agreement on fees (subject to the court's later review) so long as negotiating fees follows agreement on relief for the class on the merits. MANUAL FOR COMPLEX LITIGATION, Fourth, §21.7 (2004).

**C. NACA Guideline**

Reasonable attorney fees must be awarded in consumer class actions so that lawyers are provided sufficient incentive to undertake the substantial risks involved in privately enforcing consumer protection laws. But excessive and unreasonable amounts should be neither sought nor awarded. Ultimate authority over fee awards rests with the court. Nevertheless, NACA firmly believes that class counsel have a special obligation not to submit excessive fee requests because fees--directly or indirectly--reduce the amount otherwise available to class members (except in "pure" fee-shifting situations, where the attorneys' fee is assessed from the defendant, not the class). We recognize that the determination of what is an "excessive" request is often difficult and uncertain. But this difficulty does *not* mean that a reasonable request equates to whatever a particular court might award in a procedural context where there may not be adversary briefing on the issue. Obligations to the class and concern for the long-run integrity of the class action system of justice require that class counsel not take undue advantage, even if a court might let it pass.

***335** ***1. Fee Discussions During Settlement Negotiations***

The Supreme Court has recognized that in a fee-shifting case the defendant has an economic interest in resolving the fee issues in a settlement negotiation along with all other statutory claims. *See White v. New Hampshire*, 455 U.S. 445, 452 n. 14, 102 S.Ct. 1162, 1167 n. 14, 71 L.Ed.2d 325 (1982). Therefore, class counsel should not simply refuse to discuss fees in negotiating settlement. But class counsel should avoid circumstances that may increase the danger of an apparent or actual improper *quid pro quo* detrimental to the class. In fact, some jurisdictions prefer that all fee discussions be postponed until the settlement is judicially approved, or at least until settlement negotiations have been concluded. *See In re Community Bank of Northern Virginia*, 418

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

F.3d 277, 308 (3d Cir 2005). One alternative is to obtain the defendant's binding agreement to all class relief and then to submit the fees issue to the court for determination.

In statutory fee-type cases, an acceptable alternative is to obtain the defendant's agreement on class relief contingent on successfully negotiating an agreement on fees. If an agreement cannot be reached, the settlement might provide that the court will determine the defendant's obligation to pay fees. It is also acceptable to negotiate fees after all relief has been agreed on for the class, and then submit the entire agreement to both the court and the class for review and approval.

In common fund cases, there is no need to discuss fees with the defendant because the class clients, not the defendant, pay the fee from the fund that was created by their counsel, in an amount decided by the court. If the amount of a fee is sought to be justified on a "percentage of the fund" basis, counsel should not negotiate a settlement that is contingent on the approval of any minimum amount. Instead, the court should be left to approve the substantive settlement itself, and only then decide the amount of a fair fee. *Staton v. Boeing*, 327 F.3d 938, 969-972 (9th Cir. 2003). So-called "clear sailing" agreements (in which the defendant agrees not to oppose a fee request of up to a certain amount) are of no relevance in such cases and should be avoided unless the historical animosity between the parties or counsel suggests the likelihood of an essentially malicious opposition by a defendant with no actual interest in the outcome of the fee award.

***336** ***2. Percentage Benchmarks for Most Common Fund Cases***

For the vast majority of common fund cases, courts and counsel should examine the reasonableness of the fees requested by the percentage benchmarks that have been recognized in similar cases. *See, e.g., Camden I Condominium Association v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) (percentage method required in common fund cases); *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993) (same). While many circuits leave it to the trial court to select between the percentage and the lodestar/multiplier methods--and class counsel must, of course, comply with the court's decision--most fee requests in common fund cases should be presented in percentage of the fund terms, absent direction otherwise from the court. Courts should ordinarily entertain fee requests on this basis in common fund cases, unless specific factors (such as significant injunctive or other nonmonetary relief, other difficulties in assessing the true monetary value of class relief, etc.) justify the use of lodestar/multiplier analysis rather than percentage analysis in the particular case.

In the absence of special circumstances, the percentage award should generally fall within (or close to) the benchmark range of between 20% and 30% of the fund value. *See, e.g., Vizcaino v Microsoft*, 290 F.3d 1043 (9th Cir. 2000), *cert. denied sub nom., Vizcaino v. Waite*, 154 L. Ed. 2d 425 (2002) (1996-2001 survey of common funds valued at $50-$200 million; fee awards of 25%-40% awarded in half of the 34 cases examined); *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) (20%-30% viewed as the "benchmark"); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 308 (3d Cir. 2005) (noting studies showing fee awards over 25% in large recovery cases); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291 (9th Cir. 1994).

Courts should limit the use of a "lodestar crosscheck" to unusually large cases, in which the monetary relief, however valued or estimated, exceeds $50 million, where reasonable fees may constitute a percentage smaller than the benchmark. Such cross-checks in typical cases simply add another level of analysis, and may even undermine the purposes of the percentage-of-the-fund approach. Where injunctive or other non-monetary relief is obtained, or where the common fund is difficult to value or its value depends upon future contingencies (such as the redemption of coupons), the lodestar/multiplier approach may properly supplant the percentage-of-***337** the-fund benchmarks. Provided the class receives real value and is receiving benefits commensurate with the fees to be awarded to class counsel, it is not per se unreasonable for counsel to set aside a monetary fund from which attorney fees will be paid even though the class may be receiving primarily equitable benefits. But counsel should be aware that "the timing of fee negotiations" in such cases may be considered as a factor by the courts in the "review of the adequacy of the class' representation." *General Motors*, 55 F.3d at 803-04. And the settlement itself should not depend on the court's approval of the amount of fees proposed by the parties. *Staton, su-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*pra.*

### *3. Issues Arising in Cases with Fee-Shifting Claims*

In a common fund case where the underlying claims are based on fee-shifting statutes, it is generally best to negotiate an additional amount representing the right to fees from the defendant directly, in order to limit the fees paid by class counsel's clients and maximize the total recovery to the class. It may be appropriate in such a case to merge the statutory fee into the common fund (*see Skelton, supra*), and to also obtain a portion of the fees from the common fund. If the defendant can be persuaded to offer an additional sum for fees, that can be accepted as a credit toward a common fund award made by the court. In a statutory fee shifting case which is not converted to a common fund case, fees should be recovered solely from the defendant and be based on lodestar analysis.

### *4. Calculation of the "Fund" When Undistributed Amounts Revert to the Defendant*

The amount of the "fund" on which a percentage award is calculated should exclude any amount which may revert or has already reverted back to the defendant as undistributed funds. While it may be relevant to the calculation of a reasonable fee (for example, perhaps justifying a slightly larger percentage than otherwise appropriate) that a large total amount was initially made available for distribution to class members, the benchmark percentage figures (i.e. 20%-30%, in most cases) should be applied after deducting amounts that the defendant does not ultimately pay out as part of the settlement or judgment. It is the actual amount paid by defendant to class members, or in *cy pres* distribution, that represents the recovery in the case from which a percentage fee should be calculated. If class counsel does not wish to wait until the claims process is complete***338** to seek fees, then a partial payment may be sought based upon a percentage of any minimum payout guaranteed in the settlement agreement. Alternatively, and preferably, settlements can be negotiated which provide that any unclaimed funds be distributed *cy pres* rather than reverting back to the defendant. In that situation, a fee based on a percentage of the entire settlement amount can properly be brought upon final approval of the settlement.

### *5. Notice to the Class of Intent to Seek Fees*

Before the court can give final approval to a proposed class action settlement, notice must be provided to the class outlining the terms of the settlement. F.R.C.P., Rule 23(e)(1)(B). One of the terms which should always be included in such notice is the maximum amount of attorney fees which class counsel will or may seek as part of the settlement. In a common fund case where a percentage will be sought, that fact and the specific maximum percentage to be requested should be stated in the notice. In statutory fee shifting cases, the lodestar, if agreed to by the parties, should be disclosed in the class notice. If there is no agreement, the amount class counsel intend to request from the court should be disclosed. It is also a good idea to disclose the amount of fees per class member, if that can be easily calculated, even in approximation. For example, the class must be told that the lawyers will seek $2 million in fees, but could also be told that this equates to $6.67 per class member. The average fee per class member need not be disclosed when recoveries vary substantially among class members, since that number would not be meaningful, or in pure statutory fee-shifting contexts, where the amount has not been negotiated in advance as part of the settlement, but instead will be determined by the Court and paid by the defendant.

### *6. Fees for Future Monitoring*

As discussed more fully in Guideline 16, counsel should be aware of the need to monitor the defendant's compliance with the settlement or judgment terms. The preferable way to provide for such effort is to include

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

within any request for fees a provision that an additional lodestar request may be submitted seeking compensation for such future efforts.

## *339 GUIDELINE 9--CLASS MEMBER RELEASES

### A. The Issue

The release of claims by representative plaintiffs and class members raises several questions. Is it appropriate to release class claims without individual class member signatures? When may the scope of the class claims released exceed the scope of claims certified by the court or the scope of the pleadings? Should the scope of the class representative's individual release be identical to the scope of the class release?

### B. Discussion

In agreeing to settle a class action, the defendant understandably wishes to protect against later suits by class members for the same alleged wrongs that are being settled through the class action. Ordinary principles of *res judicata* and collateral estoppel apply in the class action context to bar claims from being litigated again later, so long as there was adequate representation of the class in the earlier case. *Matsushita Electric Industrial Co., Ltd. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). As in individual cases, defendants generally insist upon including releases within a negotiated settlement document. In some cases, defendants may also seek individual releases from class members, either as part of the language contained in claim forms or as an endorsement on settlement distribution checks. There does not appear to be any benefit from releases which do not exceed the scope of the *res judicata* bar, but neither does there appear to be any harm.

Before the *Matsushita* case, there was some uncertainty whether class-wide releases that were broader than the scope of the pleadings or certified claims were binding upon individual class members in later litigation. As a noted commentator states: "A class action settlement agreement cannot release the claims of absent class members. Only absent class members can release their own claims." Newberg §§ 12.17, at 12-52 (3d ed. 1992). But Newberg later notes that an alternative to individual releases is to include "a constructive release clause in the settlement agreement" advising that acceptance of settlement benefits releases whatever claims are described in the settlement agreement. Id. at 12-52--12-56.

The Supreme Court's decision in *Matsushita* holds that *res judicata* bars re-litigating non-certified claims (and even claims not contained in the pleadings) that are released on a class-wide basis, so long as there is adequate representation and an opportunity to opt out. Court approval ***340** of a proposed settlement should include a determination that plaintiffs and class counsel adequately represent the class on all of the settled issues, even if certification of some of the issues was previously denied.

The unanimous view of those who submitted comments to the guidelines was that if the scope of the class-wide release is limited to those claims certified by the court for class treatment, individual releases are unnecessary and unproductive. Although the consensus was that class counsel should be cautious in discussing settlement of claims beyond the scope of an earlier class certification order (or, if no order has yet been entered, beyond the scope of the pleadings), one commenter raised the issue that a defendant may be reluctant to pay substantial amounts to settle a case without the assurance that unpleaded claims are released. Several comments suggested that if settlement of such claims is agreed to, counsel should seek additional settlement compensation for class members.

While it is unusual for individual claims of a named representative to be asserted together with class claims in one complaint, in some cases instances this may be necessary. For example, cases involving housing fraud typically involve several legal claims. Although not all of the claims may be suitable for class certification, the class representative must plead all claims, including individual claims, in a single complaint. One comment stressed that it is more favorable to avoid including individual claims when possible.

The opportunity to opt out of a proposed settlement is particularly important if claims are being settled that have not been previously certified by the Court. Although it is common practice to offer class members only one oppor-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.